| | |
|---|---|
| Mr. Abraham: | Thank you, Victor. And I understand that. What I'm saying is we haven't had the time to analyze what they're doing or to get our own rebuttals. We've heard traffic experts speak. We haven't had a chance to hire a traffic expert. We haven't had a chance to hire appraisers for our land. We haven't had the chance to do any of the things that we're supposed to be able to do based on the Clarion case. And I asked for this continuance at the first meeting on May 9thth. I did not get a response. So we are still in the process of doing these things and I really do appreciate, Bob, I really do appreciate that you're trying to work with us, I do. But this thing is going to be there forever. It's going to be there for a long, long time. There's going to be ... it's a big deal. This isn't something to be taken lightly. We want to be able to analyze this and know what's going on. But, in response to Mr. Byrum's comment, we've had months. That's not true. We've had from May 9thth. And on May 9thth, the first meeting, I asked for this continuance so that we could take care of some things and handle some issues. I have questions, I have pictures, I have stuff but, to be honest with you, Mr. Chairman, none of it has to do with traffic. So I'm dead in the water, I didn't think we were going to have a chance to speak at all tonight. |
| Chairman: | I think we're trying to work with you and make sure that all areas of where you have questions have been answered. Again, the Planning Commission hasn't really asked one question yet. And we're taking a lot into consideration of what everybody is saying, but we've got a lot of time to go through here with these developers also, so ... |
| Mr. Abraham: | Mr. Chairman, will we have a chance to ask questions then after they represent this plan for the third meeting? It's the third time they've made changes. So will we have a chance then to make comments once they've made their presentation? Because I'd be happy to sit back down and wait for that. |
| Chairman: | After this meeting, the public hearing portion of this will be closed. |
| Mr. Abraham: | My only point is if there's changes, you know, as we're going along there's changes, we're not getting a chance to comment on what they're doing. Even though it looks like what they're trying to do is more beneficial than it was before. So again, I'm not trying to be ... |
| Mr. Brownson: | We could actually withdraw it, if you want it. It won't be presented if that makes you happier. |
| Mr. Barrera: | When we talk about this item being presented for the first time on May 9thth, May 9thth is really the first time in a public forum that this is being presented to the general public. Now, prior to the May 9thth meeting, there were several notices that were sent out by State statute to the adjacent property owners at a minimum 15 days prior to the meeting date, no more |

than 30 days. Everyone of those property owners were notified.

| | |
|---|---|
| Commissioner Ladewig: | Stop. |

Mr. Barrera: Along with that, we've also posted signs on the subject property notifying the individuals that are within ... that were not within the 250 feet of the subject property notified. Their thing was it was ... there were also notification in the *Daily Herald* of this public hearing. So when we talk about May 9thth being the first time that anyone was aware of it, that's not true. There have been notices been placed out in the paper, signs posted on the sides. So there's been some kind of notification. Now, when we talk about cross-examination, this Commission has allowed up to three meetings, three Planning Commission meetings that ... especially meetings being held, you know, outside of their regular meetings to listen to additional cross-examinations. So, in that matter, the Planning Commission has been more than willing and sensitive over these meetings about concerns. So, if provided, everyone had their time to talk about an ability to cross-examine, you know, all of the experts as they're called, receiving an opportunity being provided to cross-examine the traffic consultant because, unfortunately, the traffic consultant was not available at the last meeting. So, in fairness to that, we've opened this segment of the public hearing to allow the general public the ability to cross-examine the traffic expert. Otherwise, within the past two meetings, those other opportunities for cross-examination have been allowed.

Mr. Abraham: Victor, we didn't know we were going to get a chance to cross-examine. Nobody ... we were told it was closed. We didn't come prepared necessarily to do that.

Mr. Barrera: I would say, given the fact that you weren't notified, your ... members of this public we've had enough questions to ask our traffic experts this evening.

Mr. Abraham: Well, we were planning on having our own expert here at that meeting. We wanted to have a chance to hire a traffic expert to review this on our behalf and to see and to concur or not the finding of their traffic expert. Because all we're hearing from, as far as traffic experts in this room is one, and there was a gentlemen that had spoken that I think sounded like a traffic expert. But he hasn't had a chance to prepare in this. Secondly, I drive past this subject property daily. I have never ever seen a sign for public hearing posted on 60 or 176 and, I don't know, I've never seen a public hearing sign.

It's just a Rubloff real estate sign. That's it. I can't dispute the peril. I can tell you this, we received a notice approximately two weeks prior for the meeting May 9thth that this was going to happen. Well, are we supposed to run into the Village to see what the developers are going to propose? Or do we come to the meeting on May 9thth to see what's being proposed, and then

| | |
|---|---|
| | voice our concerns and ask for a continuance. Did we not do the right thing is my question. I mean, should we have come in and asked for a continuance prior to the meeting? |
| Commissioner Ladewig: | You know what? Let me just say ... |
| Mr. Abraham: | I mean, we had May 9th[th], that was our first meeting. |
| Chairman: | I don't have a specific answer for you. We need to continue on and get to more questions in reference to the traffic. That's what this is about tonight. |
| Mr. Abraham: | Okay. |
| Chairman: | So, can we do that, please? |
| Mr. Abraham: | So, after we get this new presentation that it sounded sort of like Bob was threatening to pull, we won't have a chance to comment again. Is that correct? |
| Chairman: | That is correct. |
| Mr. Abraham: | Thank you. |
| Unknown: | Do we live in the United States or do we live in Russia? |
| Unknown: | Russia! |
| Unknown: | What the heck? Gee Wee! |
| Chairman: | You're out of line, sir. Sir, you're out of line, please. |
| Mr. Rowe: | Who's out of line? My name is Michael Rowe. I live at 2230 Somerset Lane in Mundelein. I do have a couple questions for the gentlemen there. I apologize, I did not catch, but how far up Route 83 have you looked at the traffic? |
| Mr. Hamilton: | Actually, as part of the overall development, we looked beyond where Fieldcrest Drive will pull out. We didn't go beyond that. The ultimate plan on Fieldcrest Drive, it starts down here ... |
| Unknown: | That's the new direction. Sorry. |
| Mr. Hamilton: | That's okay. I know where you're going. It starts down here, it's developed under this project with ... and it's developed that part already and ultimately will go out, and ... will have a signal out at that end. We looked such and beyond that point. |

| | |
|---|---|
| Mr. Rowe: | Okay. So, if I heard you correctly, there's a signal up there at the intersection where Fieldcrest is going to enter ... come in with 83? |
| Mr. Barrera: | If possible. It has to be warranted. It has to have minimum volumes, and then at that point there could be a signal. ... when you hit those minimum volumes, then you have to ... |
| Mr. Rowe: | And then, and I'm not trying to be argumentative, yes or no? What's in here? What's proposed ... |
| Mr. Hamilton: | Well, I'll give you the government answer. It depends on the traffic. You don't put a signal up simply because somebody happened to build a building next to you. The signal is because there's enough traffic there to warrant the signal. That's State law, actually. We have to meet those minimum State warrants or State volumes, in order to ... |
| Mr. Rowe: | And you have not looked beyond that? |
| Mr. Hamilton: | No. |
| Mr. Rowe: | You have not looked beyond there to where the traffic backs up all the way from Peterson Road back to Midlothian and ... |
| Mr. Hamilton: | Not specific for this project. |
| Mr. Rowe: | You have not looked where ... we have put two new manufacturing facilities up on Peterson Road up in that corner, that is going to bring additional traffic through this section. All this going, you know, all this going to impact anybody that's trying to commute to this area. So we have not looked ... |
| Mr. Hamilton: | What we've done is we've included regional growth actually, to 2012 and then 2030, we've included a regional growth factor. We've basically taken the data we've had in every standard to account for area growth. |
| Mr. Rowe: | Okay. Again, the area growth I'm concerned with is right there, because that's where I have to spend five minutes an hour waiting to turn left out of Route, you know, in the morning and come through. And I don't know how many of the other folks here have that same issue. |
| Unknown: | Just go over and point to it. |
| Unknown: | What? |
| Unknown: | Just go over and point to it. Show them where you're at. |
| Unknown: | Long Meadow Estates is the subdivision that has the only entry on to 83. |
| Mr. Rowe: | By the way, that notice that went out to everybody affected didn't come to |

me. I consider myself affected by this. Now, my other question, you did mention something about emergency signals being basically an accommodation at the stoplight. You know, again, you're still talking about beyond the points that I think I can see on this map. These are two-lane roads. So you will have again, to the point, if you do one over here, we'll have great accommodations once we get close to that light. But, again, we're going to be ... and there was a question, which is there's nothing beyond there, but the point was actually, we're going the wrong way on 176. The other morning, I was going west, and it was backed up to Wauconda. It was miles. And again, emergency tried to get through. We'd just taken that into account possibly further. So, that's the last of my questions.

| | |
|---|---|
| Chairman: | Thank you. |
| Mr. Rowe: | I do ... I know this is difficult for everybody involved. I know you folks are up there feeling a lot of angst ... |
| Commissioner Ladewig: | Love! |
| Mr. Rowe: | ... coming out in the room. Less than love, let's leave it at that. And I appreciate that. And quite honestly, I have had up until about ten minutes ago, I've had a tremendous amount of compassion for the job you did. Victor's statement took that away. |
| Commissioner Abderholden: | Victor quoted you the State statute. You live beyond the subject property. That's why you didn't get ... |
| Mr. Rowe: | It wasn't reading me the statute, it was just a lack of, you know, I'm trying to understand your side of it which is, again, you've got a lot of folks arguing with you and yelling at you telling you you don't know how to do your job. I'm trying to understand being on that side of the fence, you know, and what I think you're hearing is trying to understand on our side of the fence which is, you know, in this case, we're going to be the ones that are going to be spending more time on the roads getting through here. The gentleman has said $2 million a year is a great enticement, but we're also going to be the ones paying the tax dollars down the road when we have to build the infrastructure to support that extra $2 million a year worth of traffic and other things going through here. So we're, you know, we're both trying to see it from each other's view. And I've been getting that, for the most part, as I said, we've lost some goodwill. |
| Chairman: | Thank you. Are there ... is there any other comments? Questions? |
| Chairman: | Please. Go ahead. Your name and address, please. |
| Mr. B. Smith: | Braden Smith, I live on Skycrest Drive in Ivanhoe. I've lived in Mundelein for about three years before the Home Depot and Target stores were there. |

|  | I'm assuming the Commission did a similar traffic study that time? |
|---|---|
| Chairman: | That's correct. |
| Mr. B. Smith: | Part of that traffic analysis, today I left Ivanhoe this morning, about 7:00 in the morning, out of the 60 exit and it took me 20 minutes to get to the intersection. 176 and 60/83. Tonight I went out to pick up dinner over by Dominick's, same thing, it took me 20 minutes to get from that intersection 60/83 and 176 back to the entranceway of Route 60 at Ivanhoe. Is that an acceptable time period in that traffic report that was done, assuming 4, 5, 6 years ago? |
| Mr. Hamilton: | Actually, I don't think so. |
| Mr. B. Smith: | So you're saying, I mean, what's an acceptable time to get through this with the new project in there? |
| Mr. Hamilton: | The level of service, which we are directed by State policy to go for, is to a level of service C or D. Either we can hit either one. But it's in C or D. Your existing conditions, and this was an existing condition before that, the Home Depot side even more, on that intersection you were at was level of service B. And you obviously just defined level of service C right there. |
| Mr. Smith: | 20 minutes? |
| Mr. Hamilton: | I don't think that's acceptable. |
| Mr. B. Smith: | Or worse. I mean, it could be up. I'm saying it's unacceptable now, and throw in a couple of traffic lights in Fieldcrest ... |
| Mr. Hamilton: | The key is ... |
| Mr. B. Smith: | Great. So now we ... anything. It's going to take me an hour to get from ... get this way to Ivanhoe to ... |
| Mr. B. Smith: | I think to 176. |
| Mr. Hamilton: | I have to do it on a line |
| Mr. B. Smith: | That's great. Actually, I think that's terrific. I think he's doing a terrific job from this standpoint. |
| Unknown: | The key here ... |
| Mr. B. Smith: | I just was trying to get an idea, and my question, really, not to drag this on, it's been long enough, but you know, what is the acceptable time frame to get from ... through this intersection? And I know you do it by letters but, time frame. Five minutes, fifteen minutes, twenty minutes, an hour? |

| | |
|---|---|
| Mr. Hamilton: | You know, you ought to be able to get down ... you're looking from the north Ivanhoe ... |
| Mr. B. Smith: | North Avenue on 60 ... |
| Mr. Hamilton: | Yeah. In the mornings, you ought to be able to get down through there in two cycles. Two cycles. I'm not saying today, but you can. But you're going from a two-lane configuration on some of those when, essentially, east/west of left turn is a five-lane configuration. There's a big difference. |
| Mr. B. Smith: | Come with me. We'll be the traffic engineer for Kildare. Come with me and take a look at the difference that adding a lane has made to Route 12 and Quentin Roads. We went from being the biggest stoppage on Route 12 to being virtually free-flow conditions in the ... by adding a through lane and a right turn made an amazing, amazing change. The requirements here is that we add lanes such that the level of service is the same or better in the future. That's not an offer. That's a requirement. |
| Chairman: | Thank you, sir. Any more questions from anybody in the audience? Okay. I would like to close the public hearing portion of this meeting and ... |
| Mr. Graft: | I know it's not pleasant to see my face again ... but I'm sorry, Mr. Chairman, I had parking questions. Are we going to do parking at another time? I didn't get the parking, and you said you wanted to move on. I see a new configuration here and, for the record, I didn't see that ... I didn't see it Friday, and I'm glad that we're thinking about new ideas and that you tell us, Mr. Chairman, that the petitioners listening to us and, yet, if we're going to have this a moving target, then we need the ability to review what they have and then ask questions of course with the new plan. And every time they revise things, I believe that last time one of your Commissioners pointed out that last Wednesday you just had received a revised drawing the Monday before. So 48 hours before ... |
| Chairman: | That had to do with buildings, yes. |
| Mr. Graft: | With the buildings, and we didn't get a copy of that. When I got my partial FOIA compliance from the Village on Friday afternoon at 4:55 from Emmett, it didn't have 22 pages of the engineering, it didn't have the revised drawing that was submitted the Monday before that you all saw, but I didn't get to see it and, therefore, my client didn't get it, and it didn't include this, and I'd ask, Mr. Chairman, when did you receive this revised drawing? Because it's on the Village overhead. But I don't see it here in the plans. |
| Chairman: | I don't have ... I didn't get a copy. |
| Mr. Graft: | Mr. Barrera, when did you receive ... when did the Village receive from the petitioner the revised drawing? |

44

| | |
|---|---|
| Mr. Barrera: | The revised drawing was presented to the Village yesterday.  Now, this evening, they're being presented as merely suggestions and not necessarily set in stone, this is a question to the petitioners ... |
| Mr. Brownson: | I can answer that question. |
| Mr. Barrera: | Ultimately, they're making that presentation. |
| Mr. Byrum: | We are going to go over this.  This is an idea that was directed exactly at the comments of your client, Mr. Morrison's client.  It is to their benefit, it's an idea that we came up with.  We wanted to present, after listening to them last week.  Now, we'd like to be able to show it to the Plan Commission.  If they think it's a good idea, they can consider it in their recommendation.  If they don't, then it was a good faith effort on our part to make things easier for your client.  And we like that ability, quite frankly, to show it, but the Plan Commission doesn't see this either. |
| Mr. Graft: | But the Village got it yesterday, and you had my business card, and you know where Mr. Morrison is, and I would appreciate it in a neighborly way to do it would have been to send me a copy so I would see it not for the first time tonight, when I'm having to rush through questions.  And I didn't know we were going to talk about traffic tonight.  And so, I wish this was more of ... it would be a lot easier for everybody if you work with us.  No one has spoken to IDOT. |
| Mr. Byrum: | I believe that the building ... |
| Mr. Graft: | Please reach out to us.  You know where I am.  I'm in Sullivan's, and I would have enjoyed not hearing it for the first time ... just e-mail it to me. |
| Mr. Byrum: | Everybody's going to hear it for the first time except for Victor, who got it late yesterday. |
| Chairman: | We would like to move on.  We're not going to have a public hearing on parking.  We'd like to close it where we are now and, so, at this moment, the public hearing portion of this is closed, and I would like the presenter to make his comments if he would please. |
| Commissioner Gunther: | I think, one thing for the public, that I would like to make sure everybody understands.  This is a preliminary plat.  We are not approving the final design of this.  This is only a preliminary plat that we're looking at.  So that's the reason these things are continuing to evolve.  This is not ... even what you see tonight may not be the final plat, which we will have to approve at a later date. |
| Mr. Callison: | I'd like to know, and I mean no disrespect, and I apologize, but my name is Mike Callison, and I'm at 639 Woodhaven Drive, and this is the very first that I've ever heard of anything like this, in terms of any type of meetings, |

|  | and ... |
|---|---|
| Chairman: | Would you come up to the microphone for a second, please? |
| Mr. Callison: | Sure.  I don't have any questions except one.  Again, my name is Mike Callison, I'm at 639 Woodhaven Drive in Mundelein.  I received something in the mail just the other day about this meeting this evening.  I haven't received any other correspondence about the other two.  And now that it's being closed, and there isn't going to be any further meetings, how are we going to be notified, as residents, what exactly is going to be happening with this property, whether something's going to be built, I don't get the *Herald*, okay?  There's many of us that don't get the *Herald*.  How are we going to know without ... when some of us have been passed by, for the other two mailings? |
| Chairman: | Well, first of all, you can attend any of the public meetings concerning this.  Secondly, I'm sure the *Herald* will be printing information based on what goes ... |
| Mr. Callison: | For those of us that don't get the *Herald* ... I get the *Tribune*, I don't get the *Herald*.  Well, okay, and again, I've only received one correspondence on a blue piece of paper from the Planning Commission.  Nothing else. |
| Unknown: | This isn't from us. |
| Mr. Smith: | Mr. Chairman, may I suggest that ... stands procedure as just mentioned by one of the other Commissioners, there's recommendations.  And when we talk about changes, what has been committed may be approved, may not be approved.   It may be approved with recommendations of changes the developer may not find satisfactory.  But Mr. Callison, to answer your question, what the Village will be doing is, when this is going to come before the full Village Board, everybody that signed in, everybody that was kind enough to put down their addresses, we'll go the extra step and see the letter is sent to let you know that it's on the Village Board agenda.  And the agenda is also on the website in 18 different ways, but we will take the affirmative step with the Village, will take the affirmative step to say everybody who signed in and provided an address will be told whatever recommendation is made, will eventually go to the Village Board.  They will ultimately decide whether the plan will be approved, we may ... if this board makes a recommendation.  And as it was also just mentioned, this is a preliminary plat.  So, there's a couple other steps, I think there's enough public interest in what's going on here, the staff of the Village is not going to have a problem in seeing that the notice is sent to you.  So, I hope that answers your question. |
| Mr. Callison: | Thank you. |

Mr. Graft:        I'm sorry. But I feel that every time there's a factual statement made about this is a concept plan and everything else that the Village's own municipal code, I believe it's Section 20, says that if the preliminary goes to the Village Board, and is approved, when it comes back for final, and you have up to two years ... the petitioner has up to two years to do that, it has to be in substantial conformity to the prior plan. But if it's not, in other words, the petitioner can change it. And, yet, this Plan Commission feels that it's not in substantial conformity, but is in accordance with the zoning regulations. And that's a very nebulous term, then it can send it out of the Board of Trustees without further public hearing. And, on this point, I think it's important to emphasize, so the audience knows it and to remind you how important these meetings are. This is a public hearing under Illinois State Statute. For the rest of the process, the Village Board, through Commissioner Gunther, back to the Planning Commission again, are public meetings. There is no legal right to cross-examine, there is no legal right to put experts on, and that's what I pleading with you. That's what my letter says. That the only time that these people have to have experts, to have the plans reviewed by an expert, and to ask questions in cross-examination like your rules provide; not just the Clarion case, but your rules provide it. Your own rules, and you're not following your own rules. The only time that these people have to protect their rights under subtle due process and procedural due process in Illinois, is here at this Plan Commission public hearing. Capital P, capital H. So, it's really not true that there's going to be a further future meeting. It's not true legally, under your own municipal code. And for that reason, you can't say that well, you know, we've had up to three meetings Mr. Barrera and including this one, okay? This is only the third. But yet you come off all dialogue, and all opportunity to present witnesses, to cross-examine. I have more questions, but I've been told now twice not to do it. Previously, I was told by a letter from Mr. Smith that's it, the public session's closed. It is inappropriate, it's wrong, and I'm begging you to not do this, to close a meeting last week and then all of a sudden, announce after we take a pledge of allegiance, that we're going to open it up but only for this particular purpose. That's not what your rules provide. And you can't make it up as you go along. Your rules don't say that. I'm asking again ... I'm protesting the process that's taking place here, because we don't have the accurate documents to be able to propound questions on, and we don't know the full impact of the plan as it sits in front of you or the revised plan. And so, I'm sorry. It's just ... I don't think it's legally true that this is going to come back again and, of course, we can go through this again. Because it's not. If you can limit discussion in public meetings that you can't in public hearings, you have no legal rights that are essential, you have several lawyers that are representing objectors right now. There was another lawyer who didn't speak that was here at the meeting last week. And so, I know there's a rush for this Plan Commission, this Village to move forward. And we don't want to stop that. We just want to know what you're doing, and then we want to be able to analyze what you're doing. And that's

the purpose of my letter. I stand on the record on that and my statement. It's not good enough to come back to a public meeting.

Chairman:     Thank you. Okay, the public hearing portion and the public comment portion is now close ...

:             The public hearing, the public comment portion is now closed, and I would like to open it up to the presenter to make his comments, if you would please.

Mr. Brownson:  My name is Bob Brownson, and I'm with Rubloff Development the developer of the project. I'll be very brief. The changes in the proposed plan that's in front of you, as Attorney Byrum suggested, are just recommendations that we put forth after listening to some of the objectors and, in fact, going out and walking the site with them along the northwest corner, primarily. And specifically, what we heard at the last meeting is they had requested a berm, and we reengineered the site, and I don't think the berm's probably high or wide as they'd like, but it's the most that could be accommodated that is above and beyond what you see in 99% of the shopping centers around. It's an 80-foot berm for the width, or wide berm, for the length of it up to the wetlands area where the buffer expands to probably ... looks like it's a little bit over 100 feet. We lost about 13 parking places in the Menards lot, I believe in this section, to accommodate it, but it was all parking that Menards feels that they can absolutely lose with out having any issues whatsoever in terms of what their needs are. The berm, as I had said before, will be 13 feet high, we put an eight foot high board-on-board wood fence on top of the berm, and then put in heavy landscaping along the objective site of this, and would be certainly happy to work with them in terms of selections and quantities to make it, you know, as good of a screening as is possible on it. Our goal on it is to be generous in terms of the screening and not skimp in any way. So, it's a ... just a suggested revision for the board to consider. The board would want to recommend we make those, we'd be certainly happy to follow through with their recommendation. At this point, I'm going to turn it over to Tracey Richard, our Civil Engineer who'll just fill in the details very briefly.

Mr. Richard:   Again, Tracey Richard with Manhart Consulting. The ... and what Bob described is, in terms of the 80-foot area along that north property line and how that was accomplished, we lost ... did lose some parking in the Menards lot and, in addition, we reconfigured a little bit of the yard, in other words, the yard in the back of Menards, this area has been pulled in. The warehouse building has been moved slightly to the south and to the west slightly. And it also now has somewhat of a kink to it versus the old plan that was straight. Those are the major changes, again, to affect a screening area within that. I've created a cross-section to provide some indication as to why or how the berm is in respect to that 80-foot area. This berm is in this 80 foot area, we used a 3-1 slope on, I'll call it the north side, towards the property owners'

side. We used about five-foot flat area on the top in which to assist with planting, because it's far easier in terms of landscaping, and then we had also used a 2-1 slope on what I call on the Menards side, which is a fairly steep slope. We would anticipate that to have natural planting. It would not proceed what I call conventional mowing and stuff. It would be very steep. We did this to accommodate the 13-foot high berm that we're showing here. In addition, we had also put a small safety fence on the ... there is a retaining wall on the Menards side, we put a small safety fence there to, you know, to protect that area as well. And that's just to get a feel for that. The other fence Bob was referring to had shown what could at the great top of the berm. In addition to that which, you know, again, the scale ... my drawing doesn't totally reflect, and that's the fact that the Menards site is actually seven to eight feet below existing grade, so that the grade ... the grade of the very ... what I call the top of the wall and the property line would in essence be approximately the same. And as the property line goes down, the berm was basically following it. So, we tried to maximize as much as we could in terms of the ...

Unknown:        Just boot it up. Hit the down arrow.

Mr. Richard:    Okay. I won't touch it again. The only other thing I'd like to mention is that we ... Menards went and moved the entranceway into the yard, that's just the little building right here, they moved it slightly to the northwest and obtained a little more stacking distance, in fact we show there, like there's a three-semi area in case that could ever possibly happen. So there'd be no impact in Fieldcrest. That's about the only other, again, minor change in that regard. But everything was concentrated along the north property line. That's the proposed revision we had planned for this. If there's any questions ...

Commissioner Rekus:        I had a question. On your rendering over there, you don't show the building, the Menards building, but can you estimate where the top of the Menards building would be?

Mr. Richard:    The Menards building from here up, and the clearance and the audience, I believe it's, when we look at the rendering, approximately 25 feet.

Unknown:        Well, on your scale, give us the 25 feet. Where would that be?

Mr. Richard:    Well, you have seven ... say seven ... this is elevation 90, the top of the berm is 13, so that's a total of ... well, I can also ... into the evergreen plant ...

Commissioner Rekus:        So it would be to about the middle of where you showed the evergreens?

Mr. Richard:    Approximate. And again, the evergreens, you know, depending on the landscaping picked, whether there's six, eight or whatever.

| | |
|---|---|
| Commissioner Rekus: | And would I be correct in saying, on the left-hand side here where the first property ... where the private property is, you would not be able to see the top of the ... yeah, right there where you put your click, from that point right there you would not be able to see the top of the Menards building, would you? |
| Mr. Richard: | The land ... I mean, from the property line, that's correct you couldn't see it. Again, the property on the homeowners' side does tend to go up.  It depends where you're standing. |
| Commissioner Rekus: | Yes.  Thank you.  And then, did you also ... excuse me, I'm sorry.  Did you also say that the 13-foot high fence is not shown there? |
| Mr. Richard: | We didn't ... I don't have it depicted within the trees. |
| Commissioner Rekus: | Again, using your pointer, in that scale, about where would the top of that 13-foot fence ... |
| Mr. Brownson: | It's an eight-foot fence.  It's an eight foot high ... |
| Mr. Richard: | Eight-foot?  I apologize. |
| Commissioner Rekus: | So it would be about the top of the ... |
| Mr. Richard: | Those are approximately right as they're shown or about these. |
| Commissioner Rekus: | Thank you. |
| Mr. Byrum: | We don't ... this is a concept that we've introduced, I think, in responses to things we've heard last week, would be offered for your consideration. We're not amending the plan.  But if you'd like to, we'd be willing to see if ... |
| Chairman: | We thank you.  I would like to open up questions to the Commission, and we'll start with ... what do you want to start with? |
| Commissioner Abderholden: | I have a question for Mr. Hamilton, is it? |
| Mr. Hamilton: | Yes. |
| Unknown: | Is there a synergy to putting these big box shopping centers next to each other versus scattering them throughout a community, as far as traffic goes? |
| Mr. Hamilton: | Sure.  Actually, the larger the square footage that's involved, the lower the traffic generation on a per-square-foot basis.  And the reason for that, by and |

large, is people make multiple stops in a single trip.  Woodfield, for instance, has a far lower per-square-foot generation than does a little local individual store, because of that cross use.  We did not take credit for that cross use between the two shopping centers, but in reality, it's going to happen.  If I come to ... and I do this in Fox Lake all the time ...

| | |
|---|---|
| Commissioner Abderholden: | So the traffic impact of putting the Wal-Mart and Menards at this location, right across the street from another big box shopping center, regionally, is less than if we put this same development of Menards and a Wal-Mart down at Midlothian 60? |
| Mr. Hamilton: | Yes. |
| Commissioner Abderholden: | And is that why the same foot concept ... is that why all the car dealers are stacked together, because then can just go to that one general area and do all of their shopping? |
| Mr. Hamilton: | Exactly. |
| Commissioner Abderholden: | Do Wal-Marts generate 92,000 car trips a week? |
| Mr. Hamilton: | A Wal-Mart Super center, and let's do it on a daily basis because nobody has weekly data ... |
| Commissioner Abderholden: | Okay. |
| Mr. Hamilton: | ... on a daily basis, we'll get on the order of ten to eleven thousand trips per day, per weekday.  So, you know, when we add it up, it's probably not ... off, ten to eleven thousand ... |
| Commissioner Abderholden: | But those aren't all destination trips. |
| Mr. Hamilton: | Oh, absolutely not. |
| Commissioner Abderholden: | In fact, the majority of them are pass-through trips. |
| Mr. Hamilton: | Well, you know ... or a half, and you get, in this case, because you've got shopping across the street, you're probably going to get diverted trips and combined trips for that, too.  But thinking just in terms of driveway volume is, I think, what they were targeting in that data.  Yeah, the numbers were more like ... |
| Commissioner Abderholden: | The Fieldcrest Drive, that's designed to alleviate the traffic conditions at 60 |

|                              |                                                                                                                                                                                                                                                                                                                                           |
| ---------------------------- | ----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|                              | and 176, is that correct?                                                                                                                                                                                                                                                                                                                  |
| Mr. Hamilton:                | That was the intention.                                                                                                                                                                                                                                                                                                                    |
| Commissioner Abderholden:    | So it's designed to be a pass-through.  Or a cut-through.                                                                                                                                                                                                                                                                                   |
| Mr. Hamilton:                | Right.                                                                                                                                                                                                                                                                                                                                     |
| Mr. Brownson:                | Designed in arterial width.                                                                                                                                                                                                                                                                                                                |
| Commissioner Abderholden:    | And it's a cut-through through a commercial development rather than a cut-through residential neighborhood?                                                                                                                                                                                                                                  |
| Mr. Hamilton:                | It's a public road that connects two State high ... three State highways, I should say.                                                                                                                                                                                                                                                     |
| Commissioner Abderholden:    | Are there plans for a gas station at this ... elements in any of the outlots?                                                                                                                                                                                                                                                               |
| Mr. Brownson:                | Not currently.  It's not to say it couldn't happen but ...                                                                                                                                                                                                                                                                                  |
| Commissioner Abderholden:    | The only 24-hour service at this development would be the Wal-Mart Pharmacy drive-through?                                                                                                                                                                                                                                                   |
| Mr. Brownson:                | Well, the Wal-Mart store itself.  I don't know what portion of the Wal-Mart would be open 24 hours, but they'd be the only retailer in there that would even consider it.                                                                                                                                                                      |
| Commissioner Abderholden:    | Would it be a problem for the developer if we didn't allow 24 hours, other than the pharmacy?  Because somewhere in here I got the idea that it was just mentioned the pharmacy being a potential 24-hour.  But somewhere there's an hour of operation that didn't indicate 24 hours for any of the stores.                                    |
| Mr. Brownson:                | Yeah, I don't really know.                                                                                                                                                                                                                                                                                                                 |
| Mr. Richard:                 | If I could comment on that, simply because of my involvement with Wal-Mart for the last 15 years and currently, Wal-Mart's desires for 24-hour operation of any and all super centers is a major decision for them if they do not.  I can't say that, you know, if you pass a demand that would kill the deal, but it definitely is a very large impact on Wal-Mart. |
| Commissioner Abderholden:    | One of the other things that Wal-Mart does traditionally is allow camping, RV vehicles in the parking lot.  Is it going to be a problem that we condition approval of this not to allow any overnight camping or storage or anything like that?                                                                                               |

| | |
|---|---|
| Mr. Brownson: | We put in a request to them based on it, and it's something that came up at one of their earlier meetings and they haven't heard back. So I don't have an answer on that. |
| Unknown: | We couldn't hear the answer, sir. |
| Commissioner Ladewig: | You guys have got to be quiet back there, please. |
| Mr. Brownson: | I sent a letter to Wal-Mart, and we haven't gotten a response at this point. |
| Commissioner Abderholden: | I'm not an expert at the traffic study, but it looks like that the highest impact of the traffic, of the increased traffic will be on Saturday. Relative higher interests. Is that correct. |
| Unknown: | Yes. |
| Commissioner Abderholden: | And is it planned for a stoplight at the Fieldcrest and 176? |
| Mr. Hamilton: | As soon as it's warranted, yes. |
| Commissioner Abderholden: | So not originally? |
| Mr. Hamilton: | No, because we don't think it's going to be warranted right off the bat. And they won't let us ... |
| | I don't all the help I'll get, but as soon as it's warranted, then it goes in. and you can't put it in in advance of warrants. |
| Mr. Brownson: | It's an IDOT decision, and we're required by our annexation agreement with the city that as soon as it is warranted that we have to pay to put it in. But we can't force IDOT to agree to put it in. |
| Chairman: | How do you determine if it's warranted? |
| Mr. Brownson: | Based on traffic movements. |
| Mr. Hamilton: | It's traffic volume. It's volume. |
| Chairman: | Does the State then take a study of that, or is that up to somebody else to do that, or what? |
| Mr. Hamilton: | The State usually requires us to take the study. But the ... typically, with a retailer, by the time he gets to the point where it's warranted, he wants to put it in because that allows traffic in and out of the site that much better. It's a |

great investment, quite honestly.  Getting them to put it in is a problem.

Mr. Byrum:   Excuse me a second.  We do have Cindy Perrin here from Wal-Mart if you do have some Wal-Mart-directed questions.  She can answer them.  Cindy, do you want to raise your hand again?

Unknown:   Do you?

Unknown:   Was this super center, again it's a question we've already asked but we might as well get it right from Wal-Mart, is this super center going to be a 24-hour operation?

Ms. Perrin:   I swore in today ...

Unknown:   Hold on a second.

Chairman:   Excuse me for just a minute.  We were here earlier, did you get sworn in?

Ms. Perrin:   Yes.

Chairman:   Okay.  Thank you.

Ms. Perrin:   Yes.  It will be a 24-hour super center.  The whole store will be open.  The pharmacy actually is closing down at 9:00, so the pharmacy is not open from 9 to 9 the next morning.

Commissioner   Will we be able to ban overnight RV parking in the Wal-Mart parking lot?
Abderholden:

Ms. Perrin:   Yes.  If the city puts in an ordinance and requests through the development and the store to do that, absolutely.  There is contractors that put the signs up that said that there's no overnight parking in the facility.  They do patrol it.  They do actually contact the store if they have any sort of camper or truck in the lot, they will go up and say hey, you can't be here.  So that can be mandated by the Village.

Commissioner   Will the Wal-Mart Super center have a gas station?
Abderholden:

Ms. Perrin:   I don't believe ... Murphy Oil would be the only gas station that really would be on the property on a Wal-Mart site.  Murphy, U.S.A.  I don't believe it's on the site currently.  That would be really up to the ... it would be pretty much on the plan right now if we were going to do that.

Commissioner   I didn't hear you completely.  So, it's a 24-hour store, not a 24-hour
Spina:   pharmacy?

Ms. Perrin:          No. Obviously.

Commission          Would Wal-Mart be opposed to, I mean, you see all the people that are here
Spina:              tonight that want to shop somewhere, but they also want to have somebody
                    that, in their backyard, they want to have somebody they can get along with
                    if it even goes that far.  Will Wal-Mart be opposed to limited hours?

Ms. Perrin:          Would Wal-Mart be opposed to a limited hours of the pharmacy or extended
                    hours?

Commission          Sure.  Anything other than 24 hours.
Ladewig:

Ms. Perrin:          That would be something that would definitely have to be pushed up
                    corporately.  Super centers are 24-hour stores.  Division one stores, like what
                    we have now in Gurnee for many homes, Wheeling, those are division one
                    stores that close at ten.  Super centers stay open through the night.

Commissioner        Excuse my ignorance, but is the Target Super center across the street, that's
Abderholden:        not a 24-hour store, is it?  We've heard that Menards will be closing their
                    store on Route 60 in Mundelein and moving here.  Does Wal-Mart have any
                    plans to close their store in Vernon Hills and move over to the super center?

Ms. Perrin:          No, sir.  That store will stay exactly where it is.  It's actually ... we're trying
                    to get it remodeled and updated, but we have no plans to move that
                    permanently.

Commissioner        Could those plans change?
Ladewig:

Ms. Perrin:          I'm sorry?

Commissioner        Could those plans change.
Ladewig:

Ms. Perrin:          The plans, right now, we have until about 2010-2011.  We like that site.  We
                    do well in that site, and the community wants us there and our plans are to
                    stay there.

Commissioner        Okay.  Enough said.  Thank you.
Ladewig:

Commissioner        With ... first of all, it's called Mundelein Town Center, and from the
Spina:              drawings Wal-Mart and Menards don't really fit in with the rest of the
                    architecture of the shopping center.   And I think if it's to represent
                    Mundelein the town, it should be more uniform than cleaner to Wal-Mart,
                    and then all the cute little shops.  Is there any way Wal-Mart would be able

to blend in with the rest of the ...

Ms. Perrin:
That I would probably have to defer to the people developing the building. Typically, you know, we want to fit in. That's our goal. I mean, we want to look like your community. And in all communities that we go in, we try to reflect what the city wants, and we try to reflect what the community wants. We have buildings all across the country that are different, and there really is not a set structure of how it has to look and that it's ... black and white. So, with the developers and the architectures, really what we request they can go back in and do the façade to the specifications or at least work with the community to make it look like ...

Commissioner Spina:
So, that's not Wal-Mart, that's the builders, then?

Mr. Brownson:
It's a joint effort. In this case, and we've been working with as fast as ... we're again, we're at the conceptual level. We have to go through the architectural review process, and we do think there's going to be add-ons and things we can do to help blend that in, you know, in terms of what, you know, decorative light, lighting, little additional paving work here and there, but there's already been a ton of work done with Wal-Mart's architects in making it all correct façade, you know, jutting out different areas so it's not just one big blank face like virtually every other shopping center.

Commissioner Spina:
But it still is, looking at the plans, it still is ... I mean, it's all brick just like everything else. But it still looks ... it doesn't blend in. I mean, it doesn't blend ... it is a beautiful piece of land that you guys are building on. And I ... and you guys know that. You have been working on a landscaping. But I think it's still ... it still could be better. The architecture, and just blending in with that beautiful landscape that you guys are building on.

Mr. Brownson:
Well, our plan there to continue to refine ... we consider that to be a finished product, and we think that's part of what your architectural review process, you know, will help flush out and, you know, we haven't gotten any negative feedback from either Wal-Mart's architecture, Menards' architect, but if it's a set-in-stone, we won't do this, we won't do that.

Commissioner Rekus:
There is supposed to be a prototype, or called a prototype, that may not be correct, but if stores do open in Plano, Texas that is much more upscale than what we're being presented with here and what we traditionally think of a Wal-Mart, is there any thoughts of possibly opening up that type of upscale Wal-Mart in this development? And if so, why not? Or if not, why not?

Chairman:
Sir, you just walked in, is that correct?

Mr. Hayes:
I was here earlier and I have been sworn in.

56

| | |
|---|---|
| Chairman: | You have been sworn in?  Would you please give us your name and your address, please? |
| Mr. Hayes: | Certainly.  My name is Richard Hayes, I'm with PB2 Architects and Engineers, our office is located in Chicago at 311 South Wacker Drive.  The Plano, Texas store I'm familiar with, and I believe that the store that is being proposed here in Mundelein is a much nicer store, and would actually be much more appropriate at this development.  The Plano, Texas store is a store that looks good in Texas.  There's actually a significant amount of efis on that store that, in our meetings with staff up to this point, we've been discouraged from the use of efis.  The Plano, Texas store has an area that looks like you could almost have a horse hitch on it, and I think that this development, with working with Rubloff and the other retailers and the staff, prepared a building that we feel is quite appropriate for Mundelein and this development. |
| Commissioner Rekus: | Why doesn't it blend in with the rest of the architecture of the property? |
| | I mean again referring to the drawings that we have that stands out.  That everything else blends in.  That's PetSmart, everything.  The ... is very ... it blends in, that's the only way I can put it.  But when you look at the Wal-Mart rendering, it just stands out.  It jumps out at you as a Wal-Mart. |
| Mr. Hayes: | Yeah, and again, I think that as Bob mentioned, you know, at this point for this particular public hearing, it's all conceptual.  And I believe that there are many more steps that we have to go through including the Appearance Review Committee to ultimately get to a point where the entire development is approved.  And depending upon ... I'm looking at a rendering here facing the audience which is printed and it looks a little different than the projected image in its colors, we have intended to be compatible and have worked with Rubloff and their architect in order to ... and they have insisted on all of their tenants to create a compatible image with the buildings.  And in the materials, in the textural features of the buildings and in the detail.  So, we've worked with staff to get to this point, and we continue ... we expect to continue working with staff and to go forward and present a building that's acceptable. |
| Commissioner Ladewig: | I'd like to address that question here, as far as with Wal-Mart.  You know, we have public hearings like we're doing now just to get public input.  We also do focus groups where you can be part of it just see ... do a trial launch or something.  Does Wal-Mart have any kind of feeling that this is going to be successful?  I mean, did they do any kind of poll to find out, does Mundelein want a Wal-Mart, or is it being proposed in Mundelein that we're going to put a Wal-Mart there?  I know you're the architect on it, and you're the Wal-Mart person, but can you answer, short and sweet, has Wal-Mart done a study to find out that this is going to be a building that would ... a |

|  |  |
|---|---|
| | store that would thrive? |
| Mr. Hayes: | I can't answer that. I can ... I'm the architect for the ... |
| Commissioner Ladewig: | I understand. But I am addressing her. |
| Ms. Perrin: | We have a whole team at the home office and they're all around the country that come out years and years before and plot places that they'd really want to be. And when you look at communities, and you look at the growth of communities and, you know, just like what we're doing right now currently fine, we're building that building. In Antioch, a few years ago, you know, we never would have thought that, you know, Antioch would be an extremely successful new store for us. They knew that there was growth there, and they put a Wal-Mart there and it's been doing very well. So, they plan all that years and years and years in advance. And this store has actually had a number, I believe it's ... I want to say it's 3893. So, I mean, this store's been planned with Wal-Mart for a while as far as being in Mundelein. And want to be in Mundelein to, you know, people that have ... At least for the last five years. |
| Commissioner Spina: | But you just ... in Antioch, you said that you didn't think it would do that well, but they put a Wal-Mart there anyway? |
| Ms. Perrin: | Just because the group, you know, when Antioch was put there, the housing and growth had just started. It's an incredible store. The community loves it. If you go to Antioch at any time of the day, it's for the community. They do community events, and they're very involved with the community. We're hoping to do the exact same thing in Mundelein. |
| Commissioner Abderholden: | Is Antioch a super center? |
| Ms. Perrin: | Yes. It's 24 hours. |
| Commissioner Rekus: | We've heard comments by the community and by the developers that this is supposed to be an upscale development. How does Wal-Mart see themselves as upscale in this development? |
| Ms. Perrin: | I, you know, I've been with Wal-Mart for 13 years. I started as a sales associate in Wal-Mart and worked my way up through the corporation and have worked in many buildings and opened five myself ... I mean, this building is an absolute beautiful building, just looking at it. Just off the pictures. I've seen many prototypes of this building, actually opened one like this in Addison, Illinois about a year and a half ago ... |
| Commissioner Rekus: | Where at? |

| | |
|---|---|
| Ms. Perrin: | Addison, Illinois. |
| Commissioner Rekus: | Can you tell me where? |
| Ms. Perrin: | On Lake Street and ... and 53. Thank you. And, I mean, again, they worked with the community to make the store exactly what the community wanted. It's very different with the flooring. The architecture in it felt it is very upscale. I know that the color schemes can be very on to what the community wants. I know the Sheboygan store that we've opened a few months ago has different colors in the façade. The fixturing ... Wal-Mart updates their fixtures ... we're changing fixturing in the presentation of our stores, you know, constantly every six months. We're redoing electronics departments and redoing what the customer wants to see when they walk into the stores. So it's very important to us that when you guys walk into your Mundelein Wal-Mart that it's your Wal-Mart. And I think you'll feel that way. I know you will. I mean, I live in Lake County too, and it's my Wal-Mart, too. |
| Commissioner Rekus: | But we have a Wal-Mart in Vernon Hills and a proposed Wal-Mart in Mundelein, I've got another neighbor probably to my southeast, that'd be Lincolnshire. Is Lincolnshire ... well, yeah, but I mean, is Lincolnshire a target for Wal-Mart? |
| Ms. Perrin: | No, no. |
| Commissioner Ladewig: | Is there a reason? |
| Ms. Perrin: | I don't have that information ... |
| Commissioner Ladewig: | And I'm only just asking, I mean, but ... |
| Ms. Perrin: | No, I just ... no. I know that as far as our area here in Mundelein, and then, like, the closest one that we would even think about would be Volo and the future and in 2010. |
| Chairman: | I have a question. This is supposed to be an upscale project. One of our major concerns is the way items are to be stored around and behind the building. I just recently had checked three different Wal-Marts, and I think especially in this area with the quality of homes in the areas overlooking this shopping center, the way that Wal-Mart stores their things is very detracting to the whole neighborhood. Is there a way that we could see something could be put under a roof under a lower level or trucks with big shipping containers that come off of boats, garbage containers that ... the box storage |

59

|                          |                                                                                                                                                                                                                                                                                                          |
|--------------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                          | areas, I mean, press-down boxes, I mean, it's just all just wide open, and it definitely is not very attractive. Do you have any suggestions on that?                                                                                                                                                     |
| Ms. Perrin:              | I don't know what they have planned for ... in the super centers, they do have the walls and the cages for the pallets to be stored in the bales. As far, I mean, I don't know what the plan is on that.                                                                                                   |
| Mr. Brownson:            | That's one of the comments we heard at an earlier meeting, and that was one of the revisions we made at the last go around, whereby we revised our site plan, eliminated one of the access points to allow us room to put in a masonry wall along the back of the property to help screen ... put the area ... but, basically the back drive area from the Ivanhoe side. |
| Chairman:                | From the Ivanhoe side?                                                                                                                                                                                                                                                                                    |
| Mr. Brownson:            | In addition. I mean, the amount of landscaping that would change to go in back there also would increase both in quality and quantity of what was originally brought in.                                                                                                                                  |
| Mr. Hayes:               | I think, also for the Wal-Mart building, at the rear of the building, there are trash compactors that are enclosed with masonry walls. There are compressors located exterior to the building that also have a decorative masonry wall around it. The ... not so much for items on the ground, but the rear parapets of the building are approximately six feet taller than the roof, which helps ... equipment. So, the Wal-Mart part of the development has gone to great strides to screen any exterior equipment, and then as Bob mentioned, and Tracey could elaborate on that, I think there are other screening features for the site itself. The ... pallet storage areas for the Wal-Mart project also screened with a masonry wall, so that any of the recycled products from cardboard to plastic, when they make these sandwiches up with bulk materials, go on to pallets and then are stored in the ... pallet storage area at the rear of the site, which again is enclosed with a masonry wall. |
| Commissioner Ladewig:    | Being the architect for Wal-Mart, who do you guys look up to as far as an upscale store?                                                                                                                                                                                                                  |
| Unknown:                 | I said Target.                                                                                                                                                                                                                                                                                            |
| Commissioner Ladewig:    | The Target? Okay.                                                                                                                                                                                                                                                                                         |
| Mr. Hayes:               | As far as the building itself?                                                                                                                                                                                                                                                                            |
| Commissioner Ladewig:    | Nah, see, I know you're the architect on this. This is more of a Wal-Mart question. I mean, just ... as far as, again, if we're going back and forth on this. I mean, it's an upscale development is what it's being touted. And you're right next to some of the most affluent homes in all of Lake County. |

I'm struggling just with the upscale part of the Wal-Mart. I mean, not for namesake ...

Mr. Brownson:   You know, I think I'm the author of that comment, and that comment was really directed that ... I mean, a Wal-Mart is a Wal-Mart. They're not going to, you know, by and large, sell totally different goods than you see at any other Wal-Mart. Well, what we are doing and have proposed is to, in terms of things we can control, the exterior of it we're definitely upgrading, both in terms of going all brick, decorative lighting, the landscaping's enhanced, the buffering, we're doing, you know, we're going way beyond, you know, the Village ordinances to, you know, try to make this fit in the best it possibly can. With that said it's, you know, a big store. It's not a boutique store. And the same is true with Kohls, and Dick's, and this site property, you're not going to change that fact. It is what it is and, you know, I think we can make it upscale by Wal-Mart standards, but it's not going to be a boutique little store.

Commissioner Ladewig:   You know, I'm new to the Planning Commission. I've been on it probably five years, and I've seen a lot of people come before us and nobody comes to mind that's tried harder to make something fit in the spot that's ... I mean, just the negative feeling you get as far as trying to put this in here. I mean, I feel for you. It's ... you're in a tough spot. You've got, again, some of the nicest surroundings, and you're trying to make this thing work, and, my God, I don't know, it's ...

Mr. Brownson:   Most of the negative feelings are coming from people whose houses are a quarter or a mile or farther away. There's three houses that are close, and we're certainly sympathetic in trying to address their concerns.

Commissioner Ladewig:   I mean, something's going to go in there at some point and, man, it just ... well, the berm is a great addition, but, you know what? I look at Deer Park, I look at Lincolnshire, I look at all the other places that are upscale ... I look at all the places that are upscale, and I don't get the upscale feeling with this. And I'm not trying to voice this publicly, but I have to because it's my job here. But, wow ...

Mr. Brownson:   Those retailers don't want to be here. We called on each and every one of them ...

Commissioner Ladewig:   Is that what it comes down to?

Mr. Brownson:   ... for three years. We talked until our face was blue. Every retailer in Deer Park, the Glen, every other lifestyle center you could possibly think of. And it doesn't fit in geographically and demographically where they want to be. You can't force them. It's not a question of offering them less money or

charging them less rent. They just don't want to be here.

| | |
|---|---|
| Commissioner Ladewig: | I mean, I'm in sales, and I know you've got to persuade people in things. Wow! |
| Mr. Brownson: | We've tried for three years. We threw everything at them we could, and there's just no interest. |
| Commissioner Rekus: | Mr. Brownson, I have a question for you regarding the town center concept. You mentioned several things, like the lighting. What other amenities, I'm going to call them, are there that are going to give this center the town center feel? In other words, will there be benches, will there be brick pavers, anything like that within the development? |
| Mr. Brownson: | I think all of the above. There will be an enhanced landscaping within some of the sidewalk areas, benches, there will be some pavers in certain areas, not, you know, throughout the whole center for a whole variety of reasons, but I think there will be all of the above. |
| Commissioner Rekus: | Okay, and there was one comment in one of the meetings about possibly putting in a bike path. Has that been considered at all, or can that be considered? |
| Mr. Brownson: | Well, we have one coming in, it's a combination of bike path/walkway through, coming off of 176 along Fieldcrest. This was something the Village staff was quite insistent on ... |
| Chairman: | How wide is that going to be? Is it going to be wide enough to handle bicycles and people, or ... |
| Commissioner Ladewig: | What's the standard path? About six or eight? I think it's about the same as a snowmobile trail. You've got enough room to pass, and that's bigger. |
| Mr. Richard: | Maybe, Bob, you just show it on the overall. But there is a walkway all the way along Fieldcrest. I don't know if that's answering the question. |
| Commissioner Rekus: | It was a bike path, an actual bike path. |
| Mr. Richard: | OKAY I mean, you know it depends on its width and location, but could be... |
| Commissioner Rekus: | What is its width? |
| Mr. Richard: | I don't think we defined it but, you know, normally bike paths are greater than six feet. |

Mr. Brownson:      It is a relatively steep incline all coming off 176 and I am not so sure it is
                   going to be picking up all that much traffic.

Commissioner       Going back to Wal-Mart. How far back is the store going to be set from the
Spina:             parking lot? I have been in many Wal-Marts where you walk out the door
                   and you are almost run over. Mundelein is a very family oriented town and
                   there a lot of young families there and I don't go to the Vernon Hills Wal-
                   Mart very often, but when I do it is almost scary. Well, the whole thing but
                   ...

Mr. Brownson:      Are you talking about the width of the sidewalk in front?

Commissioner       Yeah! I mean like Target across the street there... It is very nice. I have a
Spina:             three year old at home who loves the automatic doors and no matter how
                   hard I try he always runs for the doors and I need time to be able to catch
                   him. And I think there are a lot of families out there that try to wrangle kids
                   as they are shopping.

Mr. Brownson:      Tracey do you?

Mr. Richard:       The width varies in the front of the Wal-Mart. I guess on the average a 12-
                   foot width but it does increase and decrease, if they have that, what do they
                   call that? A pick-up area as an example right in the front. We sometimes
                   modify, you know, depending on community requirements and needs.
                   Sometimes the network of a full pickup sometimes it is made into a partial
                   and also landscaped into ... etc. But the area immediately in front is closer to
                   about twelve feet.

Commissioner       I have another question to the representative from Wal-Mart. Since this is a
Rekus:             24-hour Wal-Mart, will there be trailer traffic in the back of the store,
                   loading and unloading during the nighttime?

Ms. Perrin:        I am not a 100% sure what your ordinance hours are as far as receiving. We
                   do not have trucks. One grocery truck generally arrives at 5:00 a.m. in the
                   morning and that's really when that day begins.  As far as overnight
                   deliveries we don't receive overnights. Our doors are locked because of
                   possibilities of breaking into the building during the overnight hours.

Unknown:           Can you hear her? I can't hear you. Speak up please?

Ms. Perrin:        But as far as receiving trucks overnight. No.

Commissioner       Well then will there be trucks parked in the back there waiting to unload the
Rekus:             next morning?

Ms. Perrin:        No.

| | |
|---|---|
| Commissioner Rekus: | No. |
| Ms. Perrin: | No.  We have trucks come and they leave the truck in the receiving dock. The docks that are lowered and have the walls.  Are as far as any trucks that are waiting in the back of the building overnight.  No.  We don't have that in our Super Center.  The trucks drop off into the receiving docks and they pick up the one that is in the dock. |
| Commissioner Rekus: | So then all of the loading and unloading is done during normal business hours? |
| Ms. Perrin: | Starting at 5:00 a.m.  Generally, the last, actual general merchandise truck comes in Wednesday about 2:00 p.m. |
| Mr. Brownson: | Wal-Mart's operations people have given me the information that generally two semis in the a.m. and two in the p.m.  Typical ranges. |
| Commissioner Rekus: | And the p.m. being probably before 8 or 9 o'clock? |
| Mr. Brownson: | Yes. |
| Commissioner Rekus: | Thank you. |
| Commissioner Spina: | Mr. Brownson.  What other stores are going in? |
| Mr. Brownson: | Well the largest stores besides Wal-Mart, Menards, Dick's, Kohl's, PetSmart, Circuit City, Office Max and some smaller stores. |
| Commissioner Ladewig: | Mr. Brownson, I know that you have checked with all of these stores to try to put together a marketable product.  Was there any time factor that maybe some of the, to me, the more affluent stores, is there a time factor? Did they say there was going to be a couple of years before they wanted to move to Mundelein? |
| Mr. Brownson: | No.  It is more of location and terms where they sit versus their other life styles. |
| Unknown: | They have a 15-mile radius |
| Mr. Loarie: | Normally the lifestyle centers draw from a 15-mile radius so because Deer Park is fairly close, you know, there will never be a lifestyle center in, you know, Hawthorne Woods or Mundelein or Vernon Hills because Deer Park draws from a 15-mile radius.  That is why there is Deer Park, Geneva, Batavia and Algonquin.  So you if draw those rings in those markets you are |

drawing from a 15-mile radius and that is the normal. There is one going in Plainfield on 59. So if you start drawing 15-mile circles, you can kind of figure out, you know, because the lifestyles are a lot like regional malls in that they kinds go out from the same distance.

| | |
|---|---|
| Commissioner Abderholden: | Many of the outlots, are there going to be drive-through fast food restaurants? |
| Mr. Brownson: | There could be. At this point it doesn't look like it. Most of the restaurants that we are negotiating with are all sit-down restaurants. |
| Commissioner Abderholden: | Are there any fast food. |
| Mr. Brownson: | Not at this point. |
| Commissioner Rekus: | Are you in a position to tell us if any of those are? |
| Mr. Loarie: | Not at this point. We have been trading letter of intent with a handful of them and they are what you would expect in terms of national sit-down restaurants. |
| Commissioner Abderholden: | Would it pose a problem if we conditioned approval on having no gas stations and no drive-through fast food restaurants in the outlots? |
| Mr. Brownson: | Well our Annexation Agreement addresses limited both of those factors. I think it will help. |
| Commissioner Abderholden: | It allowed some and that is why... Just because we have an Annexation Agreement doesn't mean... and what I am asking is whether or not we condition the approval on the PUD? |
| Mr. Brownson: | Yes you can. |
| Commissioner Abderholden: | It would be a limitation on the rights that we were originally granted to you on the Annexation Agreement. On the other hand, the Annexation Agreement had you putting in residential too. Which would have been a buffer for the people of Ivanhoe? |
| | I don't feel bound by the Annexation Agreement. My question is whether or not it would pose a difficulty to the developer to basically ban gas stations and drive-through fast food establishments? |
| Mr. Brownson: | It would. It is not our preference at this point to put them in but there is 100 acres out there too. There are certain areas like Route 176 that pose different challenges than say something right in front of a Kohl's department store. |

| | |
|---|---|
| Commissioner Abderholden: | But how would having a gas station or drive-through fast food establishment fit with a upscale or more upscale development. |
| Mr. Brownson: | I think it could.  You have got 100 acres. |
| Mr. Loarie: | Look at Deer Park, for instance, they have fast foods on their outlots.  If you go to Deer Park |
| Commissioner Abderholden: | They do? |
| Mr. Loarie: | No I don't know the name but they have got on their outlots. |
| Mr. Brownson: | I don't think there is.  It might be on the other side. |
| Mr. Loarie: | Yeah!  That might be on that other side. |
| Mr. Brownson: | What there is it is not drive-through.  I don't believe. |
| Commissioner Ladewig: | There is a Chili's. |
| Commissioner Abderholden: | I am not talking about franchise foods.  More sit down and opposed franchise doesn't bother me.  We already have the White Castle on the one side and I didn't really want to see and a McDonald's on the other side. |
| Mr. Brownson: | It is not our preference either.  It is 100 acres. |
| Commissioner Spina: | I have some questions.  One of the variances we are supposed to be voting on is a variance for the pet motel.  I have some questions for PetSmart. |
| Mr. Byrum: | I don't think we have a representative here. |
| Mr. Grimes: | I'm Chuck Grimes.  I am a representative of PetSmart. |
| Commissioner Spina: | How long has PetSmart offered the pet motel? |
| Mr. Grimes: | It has just been a few years now.  We currently have three in Chicago.  Actually, four, Evanston, Lincoln Park, Aurora and Vernon Hills.  Another one in Joliet. |
| Chairman: | Sir. Excuse me. Let me interrupt you just a second.  Have you been sworn in? |
| Mr. Grimes: | Yes. |
| Mr. Graft: | He has?  You gave your name, correct? |

| | |
|---|---|
| Mr. Grimes: | Yeah! I think so. |
| Unknown: | Would you state your name again? |
| Mr. Grimes: | Yes. This is Chuck Grimes and I work out of my office in Rockford. |
| Commissioner Spina: | It said that it was going to be insulated. How do you insulate? Because that's a lot of noise. I have two big dogs and they generate … it sounds like a kennel in my house. I don't know |
| Mr. Grimes: | From the back end of it when you are in that part of the facility it's loud. From the outside in the shopping it is fairly noticeable. I don't know the construction. I know there is a lot of glass involved that separates the pets from the customers. |
| Commissioner Ladewig: | And you have built these in a number of places. |
| Mr. Grimes: | Yes. I believe we currently have companywide about 45 right now. |
| Commissioner Ladewig: | Oh! So its tried and true. |
| Commissioner Spina: | So just the glass is really insulating the noise. |
| Mr. Grimes: | No. There is drywall and I know there is some type of coating they use. I don't know exactly what it is. I can't speak from the construction side of it, but I can tell you it is not very noisy. |
| Commissioner Spina: | Okay. So you guys have like a special way of removal. I just don't want it to pile up in back. I don't want it any where. |
| Mr. Grimes: | There are some heavy-duty toilet seats, I guess throughout the hotel and all that waste goes inside toilets and then its flushed down through the sewers. So none of it goes out through the back doors. |
| Mr. Brownson: | It would be a violation of our lease and operating agreement and we will be enforcing it on behalf of our other tenants. |
| Commissioner Abderholden: | So it goes into the sanitary sewer system. |
| Mr. Grimes: | Yes. |
| Chairman: | Will the dogs stay there overnight? |

| | |
|---|---|
| Mr. Grimes: | Yes. |
| Chairman: | How big is this facility going to be for the dogs?  I mean, how many animals could you have in there.  A maximum if you come in? |
| Mr. Grimes: | Well, in most typical hotels, and I haven't seen the blueprints for this one, but at any given one time probably about 300.  And that's because we had probably 150 kennels and, you know, some pet parents want ... you may get multiple dogs and they want the dogs staying together in the same kennels.  I mean, the actual number will be about 300, but that typically happens around the holidays. |
| Chairman: | Does each animal have it's own separate kennel to stay in, or are they grouped together? |
| Mr. Grimes: | No, they can stay in their own kennels, but if the pet parent, you know, if ... we never put two different owner's dogs in the same kennel.  So, if a pet parent has two or three dogs, and they want them to stay together in the same kennel, then they'll go right in with the larger kennel for that. |
| Commissioner Spina: | How large is the square ... I don't ... how large is the square footage that the dogs will stay in?  I mean, 300 dogs, you know, needs a lot of room |
| Mr. Grimes: | Somewhere between 9,000 and 11,000 square feet. |
| Commissioner Spina: | And then you guys are certified licensed, you know ... |
| Mr. Grimes: | Yes.  Everybody before they came in to begin working back there, they have to be safety certified.  They not even allowed to work back there until they pass a safety certification.  So, yes. |
| Chairman: | Will you keep any other animals in there besides dogs? |
| Mr. Grimes: | We do have facilities for cats as well.  And the cat facility is in the same hotel, but they run on two different ventilation systems, which is separate from the store ventilation system. |
| Commissioner Rekus: | I have a question for you.  You hear all the time, you see it advertised, these pet motels and how they're really raising the level of how they treat these animals.  But in many cases, they exercise them, they take them for walks.  Do you have any outside facilities that will be used for anything like that or, you know, anything that the dogs will be outside the building for? |
| Mr. Grimes: | No, sir.  While they're in our care, they stay inside.  We do provide exercise for them, but it's inside the hotel surroundings. |
| Commissioner | Okay.  So at no time will any animals be outside other than when they're |

| | |
|---|---|
| Rekus: | entering or leaving your store? |
| Mr. Grimes: | Correct. |
| Commissioner Ladewig: | Are those upscale motels, do they also cost more then, too, if you're getting exercise? |
| Mr. Grimes: | I'm sorry? |
| Commissioner Ladewig: | With the upscale, or the next step up that gives you the exercise for your dogs, that would cost more anyway, correct?  So you're not ... you're not advertising that you're going to exercise pets? |
| Mr. Grimes: | No.  That's part of their stay.  I mean, but we do offer a la carte plate items and things of that nature.  But it's also contained within the hotel. |
| Commissioner Ladewig: | Sure. |
| Mr. Grimes: | And the square footage on this particular hotel is 46 x 32 or a bit smaller. |
| Chairman: | Is there somebody with the animals 24 hours a day? |
| Mr. Grimes: | Yes, sir.  At least two people. |
| Chairman: | At least two people. |
| Mr. Grimes: | So there would be two people working overnight. |
| Unknown: | 300 dogs? |
| Commissioner Ladewig: | On a full day. |
| Unknown: | Two people with 300 dogs? |
| Mr. Grimes: | No.  I said a minimum of two at all times. |
| Commissioner Abderholden: | I knew I read this somewhere, but this is for the lady from Wal-Mart.  I guess it was our original staff report that we received May 9th ... prior to our May 9th hearing.  Victor, does the petitioner get copies of this staff report? |
| Mr. Barrera: | They do. |
| Commissioner Abderholden: | The original staff report reflected that the Wal-Mart was going to have anticipated hours of operation, 8 a.m. to 10 p.m.  Is that a deal buster if we don't grant 24-hour ... |

| | |
|---|---|
| Ms. Perrin: | That's not something that I can answer for you.  That would have to be something corporately, they would be able to handle for you.  I mean ... |
| Mr. Brownson: | That wouldn't have come from me, where, I don't know, Victor talked to somebody at Wal-Mart or not, but it wouldn't have come from me. |
| Mr. Barrera: | I'd have to doublecheck it, but I believe that information was taken off and dropped out of the book or the packet that was given to you. |
| Commissioner Abderholden: | That's what I thought, too, but I haven't been able to find it at the beginning of the book. |
| Mr. Brownson: | The operational summary I had that summarized the hours and deliveries for each of the towns doesn't show it.  It shows only for non-... |
| Commissioner Rekus: | I saw a minute ago the representative of Menards here.  May I direct a question to him? |
| Mr. Berg: | Yes, sir.  I'm here. |
| Commissioner Rekus: | We've heard from a representative of Wal-Mart how, in the architecture of Wal-Mart that they certainly are in a position to consider possibly changing the look of the front of their store.  Am I kind of saying that correctly?  Dependent upon the, you know, further reviews?  Because I look at the Menards store.  The Menards store is a Menards store, is a Menards store.  Is Menards ... would they consider at all changing the look of their store to be more in uniform with the remainder of the stores in the town center? |
| Mr. Berg: | To some extent, yes. |
| Commissioner Rekus: | And are there certain things about the Menards store that are just so part of Menards, for example, the poles in the front of the store?  Are those going to stay no matter what happens?  Are there certain elements within the ... |
| Mr. Berg: | Certainly. |
| Commissioner Rekus: | Can you tell us what those are? |
| Mr. Berg: | You know, the entrance, the oval-shaped glass doors, the Menards sign is fairly sacred, yes.  Just like any retailer, we want to be a Menards |
| Commissioner Rekus: | Okay.  At almost every Menards that I've looked at in the past, May 9th or before that, they've had flags on the top of those poles.  You don't indicate any flags.  Does that mean that there will be no flags on the top of those poles? |

| | |
|---|---|
| Mr. Berg: | Yes. I think one of the early comments from Victor was to remove the flags, and that's why you don't see them. |
| Commissioner Rekus: | I see. |
| Mr. Berg: | I mean, this has gone on for a while, but I believe that this will happen. |
| Commissioner Rekus: | So you're saying there is a possibility that, with the Architectural Review Committee, upon their recommendations, that Menards might be able to make that store conform a little bit more to the architectural look of the remainder of the shopping center? |
| Mr. Berg: | Yes. And I've done several things to upgrade the appearance of this store up to this point. |
| Commissioner Rekus: | I must say you've been very helpful, very considerate. You've made some very drastic changes, especially like with the berm and moving your warehouse on it. But I just wanted to address the front of the store, because as I look at the renderings, and you have some very nice architectural elements within the shopping center, and then when you get to a Menards store, it kind of stands out like a sore thumb. |
| Mr. Berg: | Point taken. I want to say well, that's good, because everybody knows it's a Menards, and there, here we are. But I've added architectural elements over the course of the last two to three months based on comments from the Village and, like, the other retailers anticipate that process to continue. |
| Commissioner Abderholden: | And probably, the easiest thing to make it better for all the development is to have a better streetscape with more trees and a wider sidewalk in front of the full length of the establishments. I mean, I just think that's going to help make it more of an upscale-sort-of looking presentation. |
| Mr. Berg: | And we have some of those elements. Most of the front of the store already has a planter box. I mean, you can see it under the windows in this area. It certainly can be extended further. There are some trees within that sidewalk in front of the Menards store already. Not very many, I'll give you that. But, to some degree, those elements are already there. |
| Chairman: | I've got a question. In the back area, you've increased the vehicle stacking, but my thought was, based on the volume, would it be practical to put in two in-lanes for the trucks and one out-lane, so that if we are stacking more than three trucks, you have room to get in and out of the street? |
| Mr. Berg: | To my knowledge, we have done that in the past. I don't see any reason why I should stand up here and say that no, that's not a possibility. I do want to remind you that we provided the stacking, it went from two to three, and also |

71