**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **RUBLOFF DEVELOPMENT GROUP, INC., RUBLOFF MUNDELEIN LLC, McVICKERS DEVELOPMENT, LLC, McVICKERS NEW LENOX, LLC, McVICKERS COOPER, LLC, McVICKERS HICKORY CREEK, LLC, McVICKERS TONNELL, LLC, McVICKERS WILLIAMS, LLC,** | |
| | **Case No. 10 C 3917** |
| **Plaintiffs,** | **Hon. Harry D. Leinenweber** |
| **v.** | |
| **SUPERVALU, INC., d/b/a JEWEL-OSCO, and THE SAID CONSULTING GROUP, INC.,** | |
| **Defendants.** | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendants' Motions to Dismiss Plaintiffs' Consolidated Complaint, and the Consolidated Motion of the two Rubloff entities to dismiss the Counter-Complaint of Defendant The Saint Consulting Group (hereinafter, "Saint"). For the following reasons, the Defendants' Motions to Dismiss are granted and the Rubloff entities' Motion to Dismiss is denied in part and granted in part.

**I. BACKGROUND**

At the heart of this case is the battle for grocery shoppers' dollars in suburban Chicago. Plaintiffs develop shopping centers and say Defendants used sneaky and underhanded tactics to try to

kill or delay their developments, which would have included grocery stores that compete with Defendant SuperValu, Inc. ("SuperValu").

Plaintiffs brought actions alleging federal and state antitrust violations, RICO violations, tortious interference with prospective economic advantage, common law fraud, abuse of process and conspiracy to commit overt tortious and unlawful acts.

Defendants do not really deny they were sneaky, but claim being sneaky is legal under the Constitution. Defendant Saint brings Counterclaims against the two Rubloff entities, contending these Plaintiffs paid a former Saint employee to hand over confidential information, which exposed their underhanded tactics. Saint alleges inducement of breach of fiduciary duty, conversion, replevin, tortious interference with contractual relations and misappropriation of trade secrets.

## A. The Parties

Plaintiff Rubloff Development Group, Inc. ("Rubloff Development") is a Rockford, Illinois corporation. Plaintiff Rubloff Mundelein, LLC ("Rubloff Mundelein") is also in Rockford. (The Rubloff entities are referred to collectively as "Rubloff"). Rubloff develops commercial real estate, including shopping centers. All other Plaintiffs are collectively referred to as "McVickers," and have their primary place of business in Buffalo Grove, Illinois. They, too, develop commercial real estate.

- 2 -

Defendant SuperValu, Inc. ("SuperValu") is a Delaware corporation headquartered in Minnesota. It has interests in many grocery store chains, such as Albertson's, Jewel-Osco, Cub and others.

Defendant Saint is both incorporated in and has its principal place of business in Massachusetts. It is a consulting firm that advertises itself as "protect[ing] clients from unwanted competition" and touts its staff as "Walmart killers."

## B. The Developments

Rubloff acquired a purchase option on a parcel near Mundelein, Illinois (the "Mundelein Development") that was annexed to the village in 2005. Rubloff planned to develop a shopping center, and signed an agreement with Menards to buy part of the parcel. It also reached an agreement "in principle" with Walmart for another portion of the parcel and signed lease agreements with several other big-name stores. Rubloff expected construction to start in 2007 and finish in 2008.

In December 2005, Rubloff began talking with landowners near the parcel as part of its development efforts. Rubloff contends these meetings were going along just swimmingly – that nearby landowners did not object to the development in principle – when it ran into a wall.

Several landowners retained the unfortunately named attorney William Graft ("Graft"), who began pressing certain objections to

- 3 -

the development, both in hearings with the village and in court.
Landowners objected to the loss of wetlands, possible grease and
oil runoff from the parking lot, traffic congestion, landscaping
plans, fencing, lighting and other concerns. Two groups of
landowners (the "Acker" plaintiffs and the Ivanhoe Country Club
"Ivanhoe") sued the Mundelein in the fall of 2007 in Lake County
Circuit Court, alleging violations of due process rights in zoning
approvals Mundelein had granted. These cases were consolidated.
Ivanhoe also filed suit directly against Rubloff in January 2009,
alleging nuisance and trespass against the not-yet-developed
shopping center. The legal fight continued until January 2011,
when Mundelein and Rubloff settled all three lawsuits, with Rubloff
agreeing to certain redesigns and paying out a total of $200,000 to
various plaintiffs.

The battles caused great delay and the Mundelein development
is still not built, and may never be, according to Plaintiffs.
Rubloff claims millions of dollars of expenses due to the delays
and millions in lost profits.

Meanwhile, in New Lenox, Illinois, McVickers was also planning
a shopping center (the "New Lenox Development"). It acquired 73
acres in 2005, and signed land sale contracts with Walmart and
Menards. It also had lease or purchase agreements with Aldi Foods
and many other big-name stores. Like Rubloff, it expected to break
ground in 2007 and complete construction in 2008. It, too, ran

into problems getting permits from New Lenox and the Illinois Department of Transportation ("IDOT"). Its construction start was delayed until late 2009, forcing it to pay additional purchase option fees and suffer the loss of several stores. It also claims lost sales tax revenue due to the delays, and attributes Menards' indefinite delay in building on its parcel to the delays.

All of this bad fortune would likely have been attributed simply to the whim of NIMBY ("Not In My Backyard") residents had it not been for a man named Greg Olson ("Olson"). Or, more accurately, a man named Leigh Mayo ("Mayo"), which was Greg Olson's real name. Mayo contacted Rubloff co-founder Robert Brownson ("Brownson") in August 2009 and dropped a bombshell.

Mayo was an *agent provocateur* for Saint and used the pseudonym of Olson to organize local opposition to the Mundelein development. SuperValu had retained Saint in 2007 and Mayo, in turn, had engaged Graft to represent community landowners before the Mundelein Village board and in the state court proceedings. Plaintiffs allege community members were never told that Graft was actually being paid by SuperValu. Saint's practice was to have "project managers" like Mayo use pseudonyms, even employing e-mail accounts utilizing the pseudonyms.

Over the course of several meetings, Saint alleges, Brownson, a lawyer, learned that Mayo had signed a confidentiality agreement but nonetheless induced him (by paying Mayo) to turn over roughly

3,000 Saint documents. The documents revealed that Saint's avowed purpose was to delay or kill the development, and delays won at village hearings and in court were celebrated with glee. In one report to SuperValu, Saint boasted "the hearings under administrative review could take an enormous amount of time as court dockets are clogged and a Judge will allow us to present testimony for as long as we desire." Pl.'s Compl. 8. Attorney Graft celebrated delays as well, updating Saint on litigation progress and also reveling in delays. "Happy 1 year Anniversary, by the way. We cost these guys [Rubloff] a ton of money," he wrote to Saint. *Id.* at 14.

Other questionable tactics included the rewriting of expert reports for use in litigation, "backchannel" communications with a Lake County judge to try to get a read on how that litigation would turn out, and attorney Graft's failure to promptly forward settlement offers to his landowner clients, presumably as another delay tactic.

The exposure of these documents to public light in a *Wall Street Journal* article cost Saint at least one client, it alleges.

## C. Procedural Background

Plaintiffs and Saint agreed to proceed to summary judgment on one count of Plaintiffs' First Amended Complaint, which sought a declaratory judgment that "no privilege, trade secret, or other protection exists" in the Saint documents Rubloff acquired. The

Court reviewed the documents and ruled on June 30, 2011 on a declaratory judgment count that Saint's various contentions, including claims of confidential business information, were without merit. The one exception to this ruling was twelve pages dealing with an unrelated Hoffman Estates matter and attorney Graft. Saint claimed the same attorney-client privilege in regard to those twelve pages that it had in regard to Graft legal documents concerning the Mundelein development. The Court found no privilege as to the latter documents because Saint was not Graft's client (the landowners were), even if Graft had been paid by Saint or SuperValu. But because there was no evidence before the Court on whether a similar client arrangement existed in the Hoffman Estates matter, the Court presumed the documents were indeed privileged.

On September 15, 2011, the Court denied a motion to reconsider the summary judgment, despite Saint's contention that Rubloff was threatening further exposure of the documents to leverage a settlement.

## II. **LEGAL STANDARD**

On a motion to dismiss, all of a plaintiff's and counter-plaintiff's allegations are treated as true. FED. R. CIV. P. 12(b)(6); *Wigod v. Wells Fargo Bank, N.A.*, No. 11-1423, 2012 U.S. App. LEXIS 4714, at *2 (7th Cir. March 7, 2012). Complaints and counter-complaints will survive a motion to dismiss if they contain sufficient factual matter to state a claim to relief that

is plausible on its face. *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* at 1940.

Claims of fraud are subject to a heightened pleading standard, requiring a pleader to state with "particularity" the circumstances of fraud. FED. R. CIV. P. 9(b).

### III.  DEFENDANTS' MOTIONS TO DISMISS

#### A.  Antitrust Issues

#### *1. Antitrust Standing and Injury*

The statutory language allowing private prosecution of antitrust laws has been construed to limit the bringing of such action to (1) those who have suffered the type of injury antitrust laws were intended to prevent and (2) those whose injuries are a result of defendants' unlawful conduct. *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 595 (7th Cir. 1997) (hereinafter, *Serfecz II*). The former is commonly referred to as "antitrust injury" and the latter as "antitrust standing." *Kochert v. Greater Lafayette Health Servs.*, 463 F.3d 710, 716-719 (7th Cir. 2006). The Supreme Court has outlined "several factors to be considered in determining whether a plaintiff is the proper party to bring a private action under the antitrust laws:  (1) the causal connection between the antitrust violation and the plaintiff's injury; (2) the nature of the plaintiff's injury and the relationship between the

- 8 -

plaintiff's injury and the type of activity sought to be redressed under the antitrust laws; and (3) the speculative nature of the plaintiff's claim for damages and the potential for duplicative recovery or complex apportionment of damages." *Serfecz II*, 67 F.3d at 595-596 (*quoting Associated Gen. Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 537-546 (1983)).

In *Serfecz II*, a shopping center owner (Serfecz) sued a grocery store chain, Jewel, and a shopping center under antitrust laws. Jewel had moved out of Serfecz's center to a nearby center, but refused to relinquish the empty store in Serfecz's center to prevent competition by a new tenant.

Because the alleged antitrust activity was monopolization of the grocery store market in the local area, the district court and appellate court found Serfecz had neither antitrust standing nor injury relative to the grocery store market. As neither a competitor nor customer of a grocery store, (Serfecz was deemed a supplier of lease space to grocery stores) Serfecz's injury (lost value to his shopping center) was too indirect to the antitrust activity alleged. *Serfecz II*, 67 F.3d at 598. He also had no antitrust standing because he was not the party who could most efficiently vindicate the purposes of the antitrust laws. *Id.* at 598 (suggesting competing grocery stores or Jewel customers would have standing).

- 9 -

"Where a more directly injured class of potential plaintiffs exists, we are left with very little leeway to address the likelihood of whether any members of that class would actually bring suit. While the result may be somewhat frustrating in this particular case, it does provide a straightforward rule of law." *Serfecz v. Jewel Food Stores*, No. 92-C-4171, 1994 U.S. Dist. LEXIS 12239, at *27-28 (N.D. Ill. August 31, 1994) (hereinafter, *Serfecz I*).

But when the antitrust activity was defined as an attempt to monopolize the retail shopping center market, the outcome was different. Serfecz had both antitrust standing and injury. In that instance, plaintiffs were "direct participants in this market." *Serfecz II*, 67 F.3d at 599; *Serfecz I*, 1994 U.S. Dist. LEXIS 12239 at *33-34.

Plaintiffs argue that, under *Serfecz II*, they too have standing when the market is framed as the retail shopping center market. This is true, and the Court finds Plaintiffs have the requisite antitrust standing in the shopping center market, but not the grocery store market.

However, *Serfecz II*, where one of the defendants was a shopping center, also shows why Plaintiffs in this case do not have anticompetitive injury in the shopping center market.

In *Serfecz II*, anticompetitive injury as a result of the antitrust activity was clear: One of the defendants was a

participant in the shopping center market and was trying to foreclose competition in that market.

Here, Plaintiffs have clearly stated the anticompetitive injury to the grocery store market (SuperValu's retention of high market share allows it to raise grocery prices) but not to the shopping center market. Plaintiffs note they have incurred millions of dollars in damages, and that the Mundelein development may have been successfully scuttled. But the antitrust laws protect competition, not competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). Plaintiffs have not alleged their injury was a result of any anticompetitive activity of Plaintiffs with respect to the shopping center market.

That is not surprising because SuperValu (a grocery store chain) and Saint (their consultant) logically would have an interest in the shopping center market only as incidental to the grocery store market. That is why Plaintiffs repeatedly refer to shopping center developments only in terms of Wal-Mart. (*E.g.*, "The objective of the conspiracy was to increase SuperValu's market power by preventing competition from Wal-Mart at the Mundelein Development." Pls.' Compl. 29.)

"Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Serfecz II*, 67 F.3d at 595. There is a proximate cause element. *Id.* "[P]laintiffs must prove antitrust

- 11 -

injury, which is to say . . . [one] that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations . . . would be likely to cause." *Brunswick*, 429 U.S. at 488, 489 (1977) (citations omitted).

Here, there is no causal connection between the antitrust violation (restraining competing grocery stores in the Chicagoland area to raise grocery prices) and the Plaintiffs' injury (loss of a shopping center or its devaluation).

Antitrust actions require that Plaintiffs allege an injury to the *public*, not just themselves. *Pelfresne v. Vill. Of Lindenhurst,* 03-6905, 2004 U.S. Dist. LEXIS 14176 *44 (N.D.Ill. July 26, 2004). There is no allegation as to the anticompetitive effect upon the retail shopping center market, be it in increased prices or decreased output.

Thus, the Court finds that Plaintiffs' injuries are too remote from the anticompetitive behavior and effects alleged (restriction of trade of *grocery* stores, leading to higher grocery prices).

Both Defendants and Plaintiffs acknowledge in their briefs that, for the purposes of the actions alleged here, federal and Illinois antitrust acts are identical. Pls.' Opp'n. 26, n. 15.

Therefore, the outcome is the same with respect to the state law antitrust claims.

## 2. *Noerr-Pennington* Doctrine

Even if Plaintiffs could adequately allege antitrust standing and injury, *Noerr-Pennington* would provide protection for almost all the alleged antitrust activities.

The *Noerr-Pennington* doctrine extends "absolute immunity" from antitrust laws to "businesses and other associations when they join together to petition legislative bodies, administrative agencies or courts for action that may have anticompetitive effect." *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 841 (7th Cir. 2011). This is particularly true when part of the petitioning is a publicity campaign directed at the general public and seeks legislative or executive action. These efforts enjoy "antitrust immunity even when the campaign employs unethical and deceptive methods." *Id.* at 844 (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988)).

### a. Misrepresentations to Municipalities, IDOT and the Public Regarding the Developments

Given the allowance for unethical and deceptive methods in the legislative and executive arena, and in any accompanying public relations campaign, the Court finds *Noerr-Pennington* is applicable to those allegations concerning Defendants' alleged misrepresentations to villages, IDOT and landowners about

- 13 -

Plaintiffs' development.  As will be seen, an exception to *Noerr-Pennington* is more readily had for adjudicative proceedings, but Plaintiffs do not allege that these misrepresentations to municipalities, IDOT and the public were in the context of adjudicative proceedings.

### I.  Sham Litigation and Fraudulent Litigation

Where adjudicative petitioning is concerned, however, fraudulent representations can destroy *Noerr-Pennigton* immunity. *Mercatus*, 641 F.3d at 842 ("[T]here is little doubt that fraudulent misrepresentations may render purported petitioning activity a sham not protected from antitrust liability.")

There are two branches of the doctrine in regards to litigation: (1) sham lawsuits; and (2) fraudulent misrepresenta-tions. *Id.*  Plaintiff states allegations relevant to both.

"[A] misrepresentation renders an adjudicative proceeding a sham only if the misrepresentation (1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding." *Id*. at 843. "[A]lthough successful petitioning activity may not, as a general matter, be deemed a sham, the fraud exception can remove that immunity if success is achieved by means of intentional falsehoods." *Id*.  "If the *government's* action was not dependent upon the misrepresented information, the misrepresented information

- 14 -

was not material." *Id.* (emphasis added) (quoting *Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998).

Here, the alleged fraud was a misrepresentation of who was funding the state lawsuit, rewritten expert reports used in litigation (Plaintiff did not allege that the rewritten report was false), backdoor communications with the judge for a read on how a ruling may come out (which turned out to be inaccurate, because the judge ruled for Mundelein), and Graft's failure to promptly report settlement offers to his clients. None of these implicate materiality with respect to the *government's* (*i.e.*, the judge's) action; indeed there is no allegation of misrepresentation to the judge at all. Therefore, these are immaterial, and the misrepresentation exception cannot be found on these grounds.

As to the sham lawsuit branch, the lawsuits must first be objectively meritless before any exploration of subjective intent can be undertaken. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993) (hereinafter, "*PREI*"). A successful action, by definition, cannot be objectively meritless. *Id.* at 61. Only if a court makes the determination that a lawsuit was objectively meritless may it then inquire into the plaintiff's subjective intent in an exploration of whether the intent was not to win, but to interfere directly with the business relationships of a competitor. *Id.* at 60-61.

Plaintiffs allege the Lake County suits were undertaken "without regard to merit" but do not allege they were objectively meritless. They point out that Saint founder P. Michael Williams has written a book referencing similar dilatory litigation, and allege on "information and belief" that Saint has initiated dozens or hundreds of such lawsuits against Walmart developments without regard to merit, and that most have been unsuccessful. Plaintiffs believe the sham lawsuit exception is wider (in terms of being looser as to the "objectively meritless" requirement) when multiple lawsuits are at stake.

But the Court does not so read the law concerning multiple lawsuits, particularly because in *PREI*, Justice Stevens' concurrence explicitly made that case and the seven-justice majority did not buy into it. *Id.* at 73 ("Repetitive filings, some of which are successful and some unsuccessful, may support an inference that the process is being misused," Stevens wrote). This case seems to fit neatly into Justice Stevens' prediction, but it was decidedly not the view adopted by the majority.

Additionally, while Plaintiffs in this case allege "dozens" of such suits filed by Defendants across the nation to the detriment of Wal-Mart, only three lawsuits (two of which were consolidated) were filed against Plaintiffs or their interests. If there is a sham lawsuit exception to *Noerr-Pennington* here, it must come from these three state court suits.

In the consolidated zoning cases, at least thirteen counts were filed. Two counts were dismissed by the landowner plaintiffs and three counts were dismissed on summary judgment. The state court granted judgment for Mundelein on one count on the pleadings, and issued a directed finding on six counts after the plaintiffs rested their case in a bench trial. Only one count went all the way through trial, and the judge ruled for Mundelein on it. The zoning cases were pending in the state appellate court and the third lawsuit was pending in the state circuit court when all three were settled under the same agreement.

Rubloff paid $200,000 and made significant concessions regarding the design of the development to settle the suits. That settlement is fatal to the sham litigation argument. *See New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) (noting a lawsuit that was settled for a significant amount could not form the basis for the sham litigation exception).

*ii. Private Conduct in Regards to the Menards Tenant*

*Noerr-Pennington* does not apply when conduct is not geared toward the petitioning of government. *Mercatus*, 641 F.3d at 850-851. Toward that end, Plaintiffs also allege that Saint contacted a shopping center owner who was landlord to a Menards store that was slated to move into Rubloff's Mundelein development. Saint encouraged the owner to lock Menards into a long-term lease in order prevent Menards from moving into the Rubloff development and

- 17 -

thereby "kill . . . or . . . serious[ly] delay" Rubloff's development. Pls.' Compl. 15 (quoting Saint memo to SuperValu). While such conduct may not fall under *Noerr-Pennington*, it is not actionable antitrust conduct. "A territorial admonition to a competitor – like other speech made in the commercial context – does not violate the antitrust laws unless it leads to an agreement to restrain trade or is accompanied by some sort of 'enforcement mechanism' designed to somehow coerce or compel that competitor to heed the admonition." *Id*. Here, there was even less than an admonition to a competitor; it was a suggestion to Planitiffs' customer. Plaintiffs do not allege that there was any coercion or enforcement mechanism to this suggestion. As a result, it is not actionable.

The Court is uncertain as to whether Plaintiffs can plead additional facts to surmount the problems with these antitrust claims, but as this is the first substantive pleading as to these claims, it gives Plaintiffs the benefit of the doubt and dismisses them without prejudice.

### B. RICO Counts

Plaintiffs claim violation of 18 U.S.C. 1962(c) and 1962(d).

### 1. *Noerr-Pennington Doctrine*

"Although the *Noerr-Pennington* doctrine originated in antitrust law, its rationale is equally applicable to RICO suits." *Int'l Bhd. Of Teamsters, Local 734 Health & Welfare Trust Fund et*

*al. v. Philip Morris*, 196 F.3d 818, 826 (7th Cir. 1999). Therefore, it provides the same protection with regards to the RICO charges, eliminating the petitioning of the municipalities, IDOT and the courts (as well as the attendant public relations campaign) from liability. *See* Section A.2. above.

## 2. RICO Standing

Neither Defendant brings up RICO standing, and admittedly, it is an easier standard to meet than antitrust standing. For instance, injury that is not necessarily anticompetitive injury is sufficient under RICO. *Schact v. Brown*, 711 F.2d 1343 (7th Cir. 1983). But RICO standing is still a hurdle greater than mere Article III standing, and requires a proximate cause analysis because the language of Section 1964(c) provides treble damages. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ("Proximate cause is . . . required."). "[E]very court that has addressed this issue has held that injuries proffered by plaintiffs in order to confer RICO standing must be 'concrete and actual,' as opposed to speculative and amorphous." *Evans v. City of Chicago*, 434 F.3d 916, 932 (7th Cir. 2006). "[A] cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *Id.* One of the factors weighing against standing is difficulty in ascertaining the amount of the Plaintiffs' damages that are attributable to Defendants' wrongful conduct. *Gregory P. Joseph*, CIVIL RICO: A DEFINITIVE GUIDE 53 (3d ed. 2010) (referencing *Hemi Group*

*LLC v. City of N.Y.*, 130 S.Ct. 983 (2010) and other collected cases).

Here, Plaintiffs have alleged mail and wire fraud as the predicate acts, and the injury of lost value of their development and millions of dollars of expenses caused by Defendants' delay of the projects. Plaintiffs have made vague references to damages amounts, but essentially they remain speculative, to the extent that Defendants alone caused them. To be sure, they were instrumental, but Plaintiffs' allegation that negotiations would have gone flawlessly with nearby landowners had Defendants not stepped in is nothing more than supposition and conclusion.

Plaintiffs contend that, had they known the real scope of the battle (*i.e.*, that Defendants were stirring up landowners rather than the opposition being a true grass-roots uprising), they could have defeated the opposition much more quickly and effectively. This, too, is supposition and conclusion, and even if true, gives no measure of how much of Plaintiffs' damages were attributable to Defendants' predicate acts, and how much is the normal expenditure by suburban shopping mall developers in the age of NIMBY.

Because the damages alleged in this Complaint are speculative and amorphous, and therefore causation of them cannot be shown, there is no RICO standing.

### 3. RICO Elements

"While dismissal of a RICO claim is appropriate if the plaintiff fails to allege sufficient facts to state a claim that is plausible on its face, the adequate number of facts varies depending on the complexity of the case." *Kaye v. D'Amato*, 357 Fed.Appx. 706, 710 (7th Cir. 2009). "Allegations of fraud in a civil RICO claim are subject to the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b), which requires . . . particularity." *Id.*

Under RICO, a plaintiff must prove four elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. *Id.*

Here, Plaintiffs' pled the "pattern" using the predicate acts of wire and mail fraud. "An act of wire fraud requires a showing that (1) Defendants participated in a scheme to defraud; (2) Defendants intended to defraud; and (3) Defendants used wires in furtherance of the fraudulent scheme. A scheme to defraud requires 'the making of a false statement or material misrepresentation, or the concealment of material fact.'" *Id.* at 714. A plaintiff must allege "a situation in which [someone] was misled or fraudulently induced to engage in activity to their detriment. *Id.* Not all questionable conduct is a "'scheme or artifice to defraud' as those terms are used in the mail and wire fraud statutes." *Id*. A misrepresentation is material if it has the natural tendency to

influence, or is capable of influencing, the decision of the decision-making body to which it was addressed. *United States v. Fernandez*, 282 F.3d 500, 508 (7th Cir. 2002). The Seventh Circuit has "repeatedly rejected RICO claims that rely so heavily on mail and wire fraud allegations to establish a pattern." *Jennings v. Auto Meter Prods.*, 495 F.3d 466, 475 (7th Cir. 2007)

Here, the alleged falsehoods were that Defendants misrepresented to the zoning litigation plaintiffs that SuperValu and Saint were not behind the opposition and litigation, and that conduct induced Plaintiffs into responding differently. The schemes to defraud, Plaintiffs say, included "back channel" communications with a judge to get a feel on what the ruling would be, the alteration of expert reports that were submitted in that litigation (but not that those reports were false as submitted), and the failure of the zoning attorney to promptly notify his clients of settlement offers that prolonged the litigation (the complaint does not say how long the notification delay was).

The question of whether this is a "scheme to defraud" is close. The wire and mail fraud statutes are incredibly broad, and require only "a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for oneself or causing financial loss to another." *United States v. O'Connor*, 656 F.3d 630, 644 (7th Cir. 2011).

Saint and SuperValu unquestionably intended to cost Rubloff money, they did it to financially enrich SuperValu, and they went to great lengths of deception in trying to do it. At the motion to dismiss stage, this Court would allow this theory if it were not for the *Noerr-Pennington*, doctrine and, as shall be shown shortly, Rule 9(b).

### a. *Federal Rule of Civil Procedure 9(b)*

Accepting that this is a sufficient scheme to defraud under the wire and mail fraud statutes, plaintiffs have not even come close to the particularity required by Federal Rule of Civil Procedure 9(b) for fraud allegations.

How the misrepresentations were made or communicated to zoning litigation clients is never explained, nor are the dates or approximate time frames (the "when"), nor are the actors who made the communications and received them (the "who"). Plaintiffs do not even specify whether these were affirmative misrepresentations to the zoning litigation clients, or just omissions. Plaintiffs cite to a Northern District Court decision and some Seventh Circuit decisions where Rule 9(b) standards were relaxed, but all took place before the Supreme Court reinvigorated pleading standards with *Bell Atlantic Corporation v. Twombly* (550 U.S. 544 (2007)) and *Ashcroft v. Iqbal* (556 U.S. 662 (2009)). In any event, those cases do not stand for the wholesale abandonment of at least as much specificity as possible, which has not been met here, and

Plaintiffs' offer to amend seems to concede this. A concrete assertion of how the wires or mails were used in furtherance of the scheme is also needed, although this is likely easily remedied by repleading.

Because the claims of fraudulent conduct are not pled with specificity, they are dismissed without prejudice.

### b. RICO Conspiracy

Since Plaintiffs have not adequately pled any violation of the predicate acts of wire and mail fraud, they have no standing to plead a conspiracy claim under Section 1962(d)). *See, generally*, *Beck v. Prupis*, 529 U.S. 494, 496. The conspiracy claims are dismissed without prejudice.

### C. Tortious Interference with Prospective Economic Advantage

To state a claim for tortious interference with prospective economic advantage, "a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Vovles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1134 (Ill. 2001).

As with antitrust issues, *Noerr-Pennington* provides immunity for economic advantage interference that comes as part of a petitioning of government. *King v. Levin*, 540 N.E.2d 492 (Ill.

App. Ct. 1989). Illinois, for policy reasons, does not recognize the filing of a lawsuit, even a baseless one, as grounds for a tortious interference suit. The only proper cause of action based on the filing of a lawsuit is either malicious prosecution or abuse of process. *Havoco of Am., Ltd. V. Hollobow*, 702 F.2d 643, 647 (7th Cir. 1983) (citing *Lyddon v. Shaw*, 372 N.E.2d 685 (Ill. Ap. Ct. 1978).

Plaintiffs correctly note that *Cacique, Inc. v. Gonzalez* runs counter to *Havoco*, ruling that a tortious interference action can be based on the filing of a lawsuit when that lawsuit is malicious. *Cacique, Inc. v. Gonzalez*, No. 03-C-5430, 2004 U.S. Dist. LEXIS 4966 (N.D. Ill. March 26, 2004). *Cacique* cites as its authority *Stafford v. Puro* (63 F.3d 1436 (7th Cir. 1995)) and *Prince v. Zazove*, 959 F.2d 1395 (7th Cir. 1992) (hereinafter, *Prince II*). In *Stafford*, the alleged tortious conduct was not the filing of a lawsuit, so it is inapposite to this case. In *Prince*, the alleged tortious conduct was, in part, the filing of an adversarial complaint in an existing bankruptcy proceeding. *Prince v. Zazove*, No. 89-C-5256, 1991 U.S. Dist. LEXIS 2718 at *13 (N.D.Ill. March 7, 1991) (hereinafter, *Prince I*). But *Prince I* and *Prince II* dealt with a different matter: a privilege of qualified immunity for submissions made to the court in *existing* lawsuits when those matters are relevant to the pending proceeding. *Prince I*, 1991 U.S. Dist LEXIS 2718 at *13 (citing to *Bond v. Pecaut*, 561 F.Supp.

- 25 -

1037, 1038 (N.D. Ill. 1983) (dealing with qualified immunity for the contents of a letter sent to a judge in a custody proceeding). Therefore, *Prince II* is also inapposite to this case.

Accordingly, the Court is bound to follow the Seventh Circuit precedent, and so *Havoco* controls.

For the reasons stated in Section A, Defendants are entitled to *Noerr-Pennington* immunity for their actions petitioning the courts, municipalities and IDOT, and the accompanying public relations campaign, so no tortious interference claim can be had for those activities. Additionally, *Havoco* and *Lyddon* prevent a tortious interference action for the filing of those lawsuits.

Accordingly, all that is left is the non-petitioning activity of Saint's contact with the Menards' landlord (*See* Section A, *supra*) and its attempt to prevent Menards from moving to Plaintiffs' planned Mundelein development. However, Plaintiffs fail under this set of allegations too, because they did not plead that such efforts induced or caused a breach or termination of the expectancy with Menards. Therefore, the tortious interference counts are dismissed without prejudice.

### D. Abuse of Process Claims

"The *only* elements necessary to plead a cause of action for abuse of process are: (1) the existence of an ulterior purpose or motive and (2) some act in the use of legal process not proper in

the regular prosecution of the proceedings." *Kumar v. Bornstein*, 820 N.E.2d 1167, 1173 (Ill. App. Ct. 2004) (emphasis in original).

"In order to satisfy the first element, a plaintiff must plead facts that show that the defendant instituted proceedings against him for an improper purpose, such as extortion, intimidation, or embarrassment. In order to satisfy the second element, the plaintiff must plead facts that show a misapplication of process, or, in other words, the plaintiff must show that the process was used to accomplish some result that is beyond the purview of the process. When process is used only for its intended purpose, there has been no misapplication of process." *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 790 N.E.2d 925, 930 (Ill. App. Ct. 2003) (internal citations omitted).

"Process" is not used here in the general sense – as in "the legal process" of suing someone, prosecuting the case, receiving judgment, etc. Rather it is used in the literal, legal sense of something issued by the court. "'Process' is issued by the court, under its official seal and must be distinguished from pleadings, which are created and filed by the litigants." *Commerce Bank, N.A. v. Plotkin*, 627 N.E.2d 746, 749 (Ill. App. Ct. 1994).

In *Plotkin*, plaintiff Commerce Bank had received all appropriate approvals from the city of Peoria to develop a piece of property into a shopping center. Plotkin then instituted a meritless suit against Commerce, plaintiff alleged, for the sole

purpose of scaring off financing for the deal in order to extort a settlement out of Commerce. Commerce was damaged by having to sell, rather than lease, its land and lost millions. The court found that while the first element was satisfied, the second was not because there was "no allegation of any misuse of 'process' by the court." *Id.*

Likewise, here, Plaintiffs have adequately alleged the first element, the existence of an ulterior motive and an improper purpose. They charge Defendants pulled the strings on litigation that ostensibly sought to restore the landowner plaintiffs' Due Process rights, but in fact was geared to cost Rubloff money and institute endless delay of its development. Plaintiffs' pleadings are replete with communications from attorney Graft to Defendants celebrating his achievement of delay after delay and costing Rubloff "a ton of money" – purposes that are clearly improper to any litigation.

But Defendants allege nothing in terms of a process issued by the court. Although they adequately pled the first element, they missed the second. Should Defendants be able to surmount this difficulty, the Court does not believe Defendants' other objections to this cause of action have merit, and the action is dismissed without prejudice.

### E.   Common Law Fraud

Common law fraud requires "(1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury." *Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 905 (Ill. 1996).

Plaintiffs essentially argue here that Saint and SuperValu actively misrepresented that they were the parties behind the opposition to the developments.  For example, Saint's project manager used a pseudonym, the reasonable implication being that he did so in order to keep Plaintiffs from learning who was behind the effort to stymie the developments.  Plaintiffs also allege Defendants misrepresented to the citizen litigants the funding source of the litigation.

Plaintiffs' theory is that these misrepresentations were intended to be communicated to Plaintiffs, and in fact were. Plaintiffs allege they relied on them, and fought the lawsuits and citizen opposition as if it were genuine grass-roots community opposition rather than a commercially motivated opposition.  Had they known their true opponent, "the Rubloff Plaintiffs could have

effectively addressed that opposition, obtained the necessary approvals for the Mundelein Development, and have proceeded . . . to build the development." Pls.' Compl. 35.

Undoubtedly, false statements (fake names and a lawyer's omission to his client as to who was actually footing the bill) were made here. And Plaintiffs make a colorable argument that these falsehoods were intended to reach the Defendants. (Otherwise, why not announce yourself and your opposition?) But the allegation that such reliance caused the injury here is shaky at best. Plaintiffs claim if they had known the real enemy, they would have prevailed much more quickly, and it was this reliance on the fact that SuperValu was not behind the opposition which caused the injury. As discussed in the standing section of the RICO count, this is too speculative to sustain allegations of reliance.

In any case, claims of common law fraud are also subject to the heightened pleading standards of Federal rule of Civil Procedure 9(b) and, as discussed in the RICO section, were not met by the complaint. The common law fraud claims are dismissed without prejudice.

### F. Common Law Conspiracy

As Plaintiffs said themselves, "Plaintiffs conspiracy claims survive to the same extent as do their underlying substantive claims." *Pls.' Opp'n.*, 35. With all substantive claims dismissed, this claim must fail. It is dismissed without prejudice.

### G.  Declaratory Judgment Claim

Plaintiffs sought a declaratory judgment in regards to their use of Defendants' documents.  This issue was dealt with in the Court's orders of June 30, 2011, and the parties did not argue it in their briefing.  Accordingly, this count is dismissed as moot.

## IV.  RUBLOFF'S MOTION TO DISMISS CROSS-COMPLAINT

### A. Inducement of Breach of Fiduciary Duty

A predicate to any liability based on a theory of an inducement of a breach of a fiduciary duty is the existence of a fiduciary duty in the first instance.  *Alpha Sch. Bus Co. v. Wagner,* 910 N.E.2d 1134, 1151 (Ill. App. Ct. 2009).  If that duty exists, the elements of the inducement claim require alleging the third party (1) *colluded* with the fiduciary in committing a breach of duty; (2) induced or participated in such breach; and (3) obtained the benefits resulting from the breach of duty.  *Id.; see also Regnery v. Meyers*, 679 N.E.2d 74, 80 (Ill. App. Ct. 1997).

Rubloff and Saint seem to agree that a fiduciary duty exists for an ex-employee who has signed a confidentiality agreement that is applicable after the termination of employment.

Rubloff maintains that if the agreement is not breached, or was invalid, no fiduciary duty has been breached.  This is correct.  "Claims based on . . . breach of fiduciary duty stand or fall with those based on contract."  *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992).  Illinois views

post-employment restrictive covenants that insist on absolute secrecy of any and all information as unreasonable and unenforceable because a person is allowed to make a living, and cannot possibly not utilize *any* information from his past job. *See, e.g., Serv. Ctrs. of Chicago, Inc. v. Minogue*, 535 N.E.2d 1132, 1137 (Ill. App. Ct. 1989); *North America Paper Co. v. Unterberger*, 526 N.E.2d 621, 624 (Ill. App. Ct. 1988); *Sencon Sys., Inc. v. W.R. Bonsal Co.,* No. 85-C-8250, U.S. Dist. LEXIS 2833 (N.D. Ill. April 6, 1988).

After the parties briefed this case, the Illinois Supreme Court revised its understanding of post-employment restrictive covenants in the context of non-compete agreements. *Reliable Fire Equip. Co. v. Arredondo*, No. 111871, 2011 Ill. LEXIS 1836 (Ill. December 1, 2011). It clarified that the test of enforceability is more than an examination of time and geography restrictions or other rote lists. Instead, its reasonability is a totality-of-the-circumstances question, judged by whether the covenant (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public. Time and geography restrictions may also be examined. *Id.* at *7-8.

In this case, Saint's broad demand that Mayo "treat as strictly confidential *any and all* information" (emphasis added)

forever, was clearly greater than required. Illinois Courts in the past have declined to rewrite such overly broad restrictions to give them any effect. *See Minogue, Unterberger*, and *Sencon*, cited above. The employee here, if held to the literal words of the contract, would not be able to hold another job in the same field, which would clearly be an undue hardship. And as this amounts to a restraint of trade, as defined by the Illinois state law precedents, would also be injurious to the public. The Court also believes that allowing an agreement to stand that would essentially sanction the misleading of dozens of landowners as to how they were used as pawns by SuperValu and Saint in their commercial fight against Walmart would also be injurious to the public.

Therefore, the agreement is unenforceable, and void as a matter of Illinois law. Because the fiduciary duty rises and falls with the contract, this claim fails.

Because the entirety of the contract was before the Court for review, and is deemed unenforceable as a matter of law, this count cannot be replead to state a cause of action. Therefore, the action is dismissed with prejudice.

### B. Tortious Interference with Contractual Relations

The tort of interference with a contract requires, as its first element, a valid contract. *HIP Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672, 676 (Ill. 1989). Thus,

the lack of a valid contract (See II.A., *supra*) is fatal to this claim, and it is likewise dismissed with prejudice.

## C. Conversion

"To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998).

The parties spar over whether the documents at issue in this case represent property recognized under this action. Rubloff cites *Conant v. Karris*, 520 N.E.2d 757, 763 (Ill. App. Ct. 1987).

There are two types of property here: the physical paper (if any) taken from Saint, and the intangible information contained within them. "[P]arties may recover for conversion of intangible assets." *Stathis v. Geldermann, Inc.*, 692 N.E.2d 798, 807 (Ill. App. Ct. 1998). "Once confidential information is released to competitors, it hardly can be said that the data is still confidential. Thus, the original owner would be deprived of the benefit of the information." *Conant v. Karris*, 520 N.E.2d 757, 763 (Ill. App. Ct. 1987) (ruling that even though plaintiff retained the information that was the subject of the conversion action, conversion could nonetheless still be alleged).

Rubloff argues that *Conant* stands for the proposition that non-confidential information is not property, and the only thing of value would be the actual paper (if any were taken, rather than electronic documents) upon which the information was written. Because the Court already issued summary judgment finding the documents contained no trade secrets, or privileged, confidential or proprietary business information (save a handful), Rubloff says, there is no property subject to conversion here, unless it is the actual physical paper.

Rubloff also cites *FMC Corp. v. Capital Cities/ABC, Inc.* (915 F.2d 300, 305 (7th Cir. 1990)) for the proposition that proprietary value of documents must be present for conversion to lie. *FMC* referenced Supreme Court decisions approving of treating confidential information as a convertible property, and that such a ruling mirrors the trend several states have adopted. *Id.*

*FMC* also noted that "copies of documents, rather than the documents themselves, should not ordinarily give rise to a claim for conversion." *Id.* at 303. "[T]he reason for this rule is that the possession of copies of documents – as opposed to the documents themselves – does not amount to an interference with the owner's property sufficient to constitute conversion. *Id.* In that case, however, the court found a cause of conversion, because the plaintiff no longer had the originals or any copies of them.

- 35 -

Rubloff says Mayo took only copies from Saint, and thus a cause of action should not lie because Saint has originals (or at least equivalent copies).

Saint cites *Hecny Transportation, Inc. v. Chu, et al.* for the proposition that information, whether privileged, confidential or not, can be the subject of a conversion action. *Hecny Transportation*, 430 F.3d 402, 405 (7th Cir. 2005) ("An assertion of trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public record.")

First, as to whether Saint has adequately alleged that originals were taken, as opposed to merely copies, we take Saint's use of the word "document" at face value, as indicating an original. At this stage, all of a Saint's allegations are taken as true. If evidence later develops that Saint was misspeaking, and they meant copies, it can be resolved on summary judgment or at trial.

As to whether information that is non-confidential or not proprietary can be converted, the Court believes Saint is misreading *Hecny*. That ruling was in the context of a defendant who had a fiduciary duty to the owner of the documents. The conversion charge also involved physical equipment, such as the fax machine and computer.

The case stated:

> If Hecny had put its customer list on its web site for the world to ogle, that would not have permitted *its managers* to go into covert competition using Hecny's own depot and staff, or to walk off with computers and fax machines, as Hecny alleges Chu did. Trade secrets just have nothing to do with Hecny's principal claims.

*Id.* at 405 (emphasis added). As the Court has already noted, there was no fiduciary duty in this case. That, and the physical equipment are what distinguishes *Hecny*. To read the case the way Saint suggests would mean that someone, even a competitor, who was browsing the web and came across the above-mentioned hypothetical customer list, and then tried to sell directly to those customers, would be guilty of conversion or theft. That cannot be.

The court's language of "trade secrets just have nothing to do with Hecny's principal claims" indicates that the court was assailing the notion that just because one is not guilty of trade secret violations, he is not granted immunity for *unrelated* torts, which was essentially what the District Court had ruled.

The law is clear that intangible property can be converted. But the cases indicate that that intangible property must have some value in terms of confidentiality, trade secrets, proprietary business information or the like. As the Court already ruled that the documents at issue had no such content, they cannot be converted (unless Saint has no originals or copies of those documents). However, the paper itself can be the subject of a conversion claim, and to the extent that twelve pages of documents

were ruled to be privileged, an action of conversion will lie for the information in those documents as well.

Therefore, within that scope, the counter-plaintiff has properly alleged a cause of conversion, and the motion to dismiss is denied as to this count.

### D. Replevin

An action for replevin may be brought to recover wrongfully detained goods or chattels. A replevin action cannot be maintained until a counter-claimant has made a demand for the surrender of the property and the defendant has refused. At trial, a counter-claimant must prove the defendant is wrongfully detaining the property. *First Illini Bank v. Wittek Indus.*, 634 N.E.2d 762, 763 (Ill. App. Ct. 1994). The property must be described in sufficient detail to distinguish it from similar chattels and a counter-claimant must state that he is the owner of the property or is otherwise entitled to lawful possession of it. Robert G. Markoff & Lawrence O. Taliana, *Replevin, Detine, and Attachment* (available at *http://www.iicle.com/links/CredRts09-Ch5-Markoff.pdf* (2009) (originally published in CREDITORS RIGHTS IN ILLINOIS (Illinois Institute for Continuing Legal Education, 2009)).

Because of the above determination regarding the nature of the property at interest, Saint has adequately alleged the elements for a replevin action. To the extent that the documents were found to

be property in the above conversion discussion, a replevin action will also lie.  The motion to dismiss is denied.

### E.  Misappropriation of Trade Secrets

As Saint concedes in its response (Dkt. 126, 10), this cause of action is foreclosed by the June 30, 2011 summary judgment order, and Saint filed the count to make its record and preserve its appeal.  It is so preserved, and the count is dismissed with prejudice.

### IV.  CONCLUSION

For the reasons stated herein, Defendants' Motions to Dismiss are granted in their entirety, and Plaintiffs' Complaint is dismissed without prejudice as to each count.  Plaintiff Rubloff's Motion to Dismiss is granted in part and denied in part.  Counts I, IV and V are dismissed with prejudice.  Counts II and III state valid causes of action.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 3/27/2012