**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **RUBLOFF DEVELOPMENT GROUP, INC.**, *et al.*, | |
| **Plaintiffs,** | **Case No. 10 C 3917** |
| **v.** | **Hon. Harry D. Leinenweber** |
| **SUPERVALU, INC.**, *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendants Saint Consulting Group Inc.'s (hereinafter, "Saint") and Supervalu, Inc.'s (hereinafter, "Supervalu") Motions to Dismiss the Third Amended Complaint (the "TAC"). For the reasons stated herein, the Motions are granted in part and denied in part.

**I.   BACKGROUND**

This Court presumes familiarity with its March 27, 2012 ruling dismissing Plaintiff's Second Amended Complaint and intends this ruling to be read in conjunction with that ruling. *See Rubloff Dev. Group, Inc. v. Supervalu, Inc.*, 863 F.Supp.2d 732 (N.D. Ill. 2012). Accordingly, only a minimum of background is recounted here.

Plaintiffs Rubloff Development Group, Inc. and Rubloff Mundelein, LLC, (collectively, "Rubloff") both of Rockford, Illinois, attempted to develop a shopping center in Mundelein,

Illinois. The development would have included a Walmart, whose grocery store portion would have competed with grocery stores owned by Defendant Supervalu. Supervalu hired Defendant Saint to delay or kill the development. Saint's agent, Leigh Mayo ("Mayo"), using the pseudonym John Olson, stirred up opposition to the development. Through Mayo, Supervalu secretly bankrolled three lawsuits by local citizens against Mundelein and/or Rubloff in relation to the development. Rubloff settled all three lawsuits in exchange for $200,000 and several concessions in the design and development of the shopping center, which remains unbuilt to this day.

The Court dismissed Rubloff's Second Amended Complaint (the "SAC") on March 27, 2012. Rubloff filed a Third Amended Complaint and both Defendants again seek dismissal.

## II. <u>LEGAL STANDARD</u>

On a motion to dismiss, all of a plaintiff's and counter-plaintiff's allegations are treated as true. FED. R. CIV. P. 12(b)(6); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012). Complaints and counter-complaints will survive a motion to dismiss if they contain sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949.

## III. **ANALYSIS**

### A. Reconsideration of the *Noerr-Pennington* Doctrine

In its March 27, 2012 ruling, the Court found that the First Amendment provided Defendants with immunity from certain governmental petitioning activities as provided for by the *Noerr-Pennington* doctrine. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965). The Court found the doctrine protected Defendants for their admittedly misleading petitioning of various villages and administrative agencies in regards to the development. It also found the accompanying public relations campaign in regards to those activities similarly protected, citing *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 841, 844 (7th Cir. 2011) (noting the doctrine provides absolute immunity for petitioning legislative and executive bodies, as well as the accompanying public relations campaigns, even if the campaigns employ unethical and deceptive methods).

The Court also recognized that fraudulent representations could destroy such immunity in regards to adjudicative proceedings, however. *Id*. at 641 F.3d at 842. The Court examined the two main exceptions to such immunity (sham lawsuits and fraudulent misrepresentation) and determined that neither applied in this case because (1) any misrepresentations alleged in the Complaint were not material to the *government's* (*i.e.*, the judge's) action in the

litigation and, (2) since Rubloff had paid a substantial sum to settle the litigation, the litigation could not be objectively meritless as required by *Professional Real Estate Investors, Inc. v Columbia*, 508 U.S. 49, 60 (1993) (hereinafter, "*PREI*"); *see also New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) (noting a lawsuit that was settled for a significant amount could not form the basis for the sham litigation exception).

Based on these findings, the Court dismissed several claims insofar as they were based upon petitioning-of-government activities.

Rubloff "acknowledge[s] that if the Court does not reconsider its ruling on *Noerr-Pennington*, all but [its] claims for abuse of process, tortious interference [based on non-petitioning activity] and civil conspiracy are [still] subject to dismissal on *Noerr-Pennington* grounds." Rubloff Pls.' Mem. in Support of their Motion for Leave to File [TAC], 11, ECF No. 154, PageID # 3974. Not surprisingly, Rubloff asks this Court to reconsider the *Noerr-Pennington* issue.

Its chief argument is that *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508 (1972) provides the framework under which its case can succeed. That case, Rubloff argues, outlines an exception to *Noerr-Pennington* where there is a pattern of baseless, repetitive litigation made without respect to merit. *California Motor Transport*, 404 U.S. at 513, 515-516.

The Seventh Circuit has not yet recognized such a "pattern" exception. *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 842 n.3 (7th Cir. 2011) (noting that the Ninth Circuit recognized such an exception in dicta, but the Seventh Circuit has not yet faced such a fact pattern).

This Court posited in its previous ruling that the strictures of *PREI* (which was issued 21 years after *California Motor Transport*) require that, to invoke a *Noerr-Pennington* "sham" litigation exception, legal claims filed by a competitor must be objectively meritless, and that this requirement foreclosed such an exception in this case.

Rubloff does not think *PREI* forecloses its "pattern" exception, and cites Ninth Circuit law that has harmonized *California Motor Transport* and *PREI*. *See USS-POSCO Industries v. Contra Costa County Bldg. & Constr. Trades Council*, 31 F.3d 800, 810 (9th Cir. 1994) (hereinafter, *USS-POSCO*). One court has gone so far as to characterize the Seventh Circuit's *Mercatus* as "implicitly reject[ing] the POSCO rule." *Waugh Chapel S. LLC v. United Food & Commer. Workers Union Local 27*, 855 F.Supp.2d 476, 488 n.18 (N.D. Md. 2012). This Court does not go that far, but does agree with *Waugh*'s characterization that *PREI* seemed to clarify that *California Motor Transport* requires litigation to be objectively baseless in order to provide an exception to the *Noerr-Pennington* doctrine. *Waugh*, 855 F.Supp.2d at 488 n.17.

Because Rubloff settled the three lawsuits at issue for a substantial sum, the lawsuits cannot be objectively meritless. *See New West, supra*; *see also PREI*, 508 U.S. 49, 60 n.5 (1993) ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham.").

This Court believes the three lawsuits at issue are additionally problematic for Rubloff because the Ninth Circuit, which Rubloff cites to for the "pattern" exception, itself does not see a "pattern" in so few lawsuits. *See Amarel v. Connell*, 102 F.3d 1494, 1519 (9th Cir. 1996) (ruling two lawsuits did not qualify as "a whole series of legal proceedings" which could potentially qualify for the *California Motor Transport* sham litigation exception, whereas the 29 lawsuits of *USS-POSCO* did constitute a "series" or "pattern"). This Court agrees and does not find the three lawsuits filed against Rubloff's interests – two of which were consolidated – to be a whole series of legal proceedings for the purposes of the "pattern" exception.

Rubloff argues that this Court's lens is too small: it should consider the litigation against Walmart that Defendants conduct nationwide rather than just the three lawsuits it funded here against the Rubloff Development, even though Rubloff was not involved in or affected by those other lawsuits around the country. Rubloff's authority for this is one unreported Colorado case, *Total Renal Care, Inc. v. Western Nephrology & Metabolic Bone Disease,*

*P.C.*, No. 08-CV-00513-CMA-KMT, 2009 U.S. Dist. LEXIS 80821, at *39 (D. Colo. Aug. 21, 2009) (noting that "'[s]ham' litigation need not always involve the targeted competitor as a named party"). *Total Renal*, in turn, relied on *USS-POSCO* for this proposition. *Id*.

This Court believes it more appropriate to refer directly to *California Motor Transport*, which noted that a successfully pled pattern exception would allege "not that *competitors* sought 'to influence public officials,' but that they sought to bar their *competitors* from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process." *California Motor Transport*, 404 U.S. at 511-512 (emphasis added).

Rubloff has not alleged it is a competitor of either Defendant. Quite the opposite: it has steadfastly asserted that Defendants' intended target in all of this was its competitor, Walmart.

It must be remembered that "the *Noerr-Pennington* doctrine originated in antitrust law." *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund et al. v. Philip Morris*, 196 F.3d 818, 826 (7th Cir. 1999). In light of antitrust law's strict insistence on the proper plaintiff in terms of antitrust standing and injury, the Court thinks it incongruous to expand the possible *Noerr-Pennington* exception (if it even exists in the Seventh Circuit) of *California Motor Transport* beyond the target of the anticompetitive behavior (competitors) to collaterally affected victims like

- 7 -

Rubloff. *See Serfecz v. Jewel Food Stores*, No. 92-C-4171, 1994 U.S. Dist. LEXIS 12239, at *27-28 (N.D. Ill. August 31, 1994) ("Where a more directly injured class of potential plaintiffs exists, we are left with very little leeway to address the likelihood of whether any members of that class would actually bring suit. While the result may be somewhat frustrating in this particular case, it does provide a straightforward rule of law.")

The Court also believes that *California Motor Transport* must be read in the light of more recent U.S. Supreme Court precedent. Rubloff insists that undertaking litigation without regard to merit is enough to invoke the exception, but that is precisely what *PREI* declined to do. *See PREI,* 508 U.S. at 56 (Plaintiff "invites us to adopt an approach under which . . . 'indifference to outcome' . . . would expose a defendant to antitrust liability under the sham exception. We decline [plaintiff's] invitation.").

Defendants "pattern" of sham litigation consists of three lawsuits that Plaintiffs paid handsomely to settle, and were therefore not meritless. The remainder of Defendants' petitioning activity was petitioning legislative and executive bodies, and its accompanying public relations campaign, which is protected by *Noerr-Pennington*. *Mercatus*, 641 F.3d at 841, 844. The Court therefore declines to reconsider its ruling on the *Noerr-Pennington* issue.

### B.  Antitrust, RICO, Fraud and Tortious Interference
### Claims Based on Petitioning Activities

Rubloff concedes that without a change in the *Noerr-Pennington* ruling "all but their claims for abuse of process, tortious interference, and civil conspiracy are subject to dismissal on *Noerr-Pennington* grounds." ECF No. 154, 11 n.4.  In accordance with this concession, the Court dismisses the antitrust, RICO, and fraud counts in the TAC insofar as they state a claim based on petitioning of government.  The Court does not reach the issue of whether those counts are pled adequately in other respects.

### C.  Non-Petitioning Activity

As the Court noted in its prior ruling, however, non-petitioning activity does not enjoy *Noerr-Pennington* immunity.  The Court therefore posited that Defendants' activities aimed at private entities might be actionable.  Specifically, the Court noted that Plaintiff's SAC alleged that Defendants approached a shopping center owner who was the landlord of a Menards store that was slated to move into Rubloff's Mundelein development.  The SAC alleged that Defendants tried to get the landlord to lock Menards into a long-term lease, in an attempt to make that tenant unable to come to the Mundelein development and thereby "kill the project or lead to serious delay." SAC 15, ECF No. 133 (quoting Saint memo to Supervalu).  Rubloff bases part of its antitrust claim on this activity and part of its tortious interference with prospective

economic advantage claim on this interaction. The Court now examines whether the repleaded Complaint, in regards to this interaction, can sustain either claim.

### 1. *Antitrust Violation in Regards to Menards Discussions*

The Court previously found this activity did not violate antitrust law because it was mere speech. "A territorial admonition to a competitor – like other speech made in the commercial context – does not violate the antitrust laws unless it leads to an agreement to restrain trade or is accompanied by some sort of 'enforcement mechanism' designed to somehow coerce or compel that competitor to heed the admonition." *Mercatus*, 641 F.3d at 850-851.

Since there was no allegation of any such enforcement, coercion or compulsion, the Court noted this was even less than an admonition to a competitor - it was a business suggestion to the landlord of a potential co-tenant (Menards) of a competitor (Walmart). The Court ruled it did not rise to the level of prohibited antitrust activity.

The TAC fares no better on this point. In fact, it concedes that "Defendants never successfully caused Menards and its landlord to execute another long-term lease." TAC, 28. Rubloff now gamely alleges that the conversation caused Menards to enter more short-term leases, but even if this is true, there is still nothing

alleged here but mere speech, and so it is not actionable under antitrust laws.

### 2. *Tortious Interference in Regards to Menards Discussions*

To state a claim for tortious interference with prospective economic advantage:

> [A] plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference."

*Vovles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1134 (Ill. 2001).

This Court dismissed the tortious interference claim in the SAC because it found that Plaintiffs "did not plead that such efforts induced or caused a breach or termination of the expectancy with Menards." *Rubloff*, 863 F.Supp.2d at 747.

On repleading, Plaintiffs allege that these discussions with the Menards landlord "caused Menards to enter into a series of lease extensions with that existing landlord . . . and resulting lease extensions caused Menards to pull out of the Plaintiffs' Mundelein Development." TAC, 37. Plaintiffs claim this "directly and proximately caused delay to the Mundelein Development, which was ultimately killed through that delay." TAC at 37.

While these allegations may not have been enough to state a case of antitrust violations, the revised Complaint cures the failure to allege that such conversations caused the breach with

Menards.   Accordingly, the TAC now adequately states a case for tortious interference with prospective economic advantage.

### D.   Abuse of Process

The Court dismissed Plaintiffs' abuse of process claim in the SAC, pointing out that they had not alleged any use "of a process issued by the court."   *Rubloff*, 863 F.Supp.2d at 747.   The Court clarified to Plaintiffs that under the state-law "abuse of process" action, Illinois courts define "process" not in the general sense of "the legal process" of suing someone, prosecuting the case, receiving judgment, etc.   Rather it is used in the literal, legal sense of something issued by the court, under its official seal, and must be distinguished from the pleadings, which are created and filed by the litigants.   *Id.* (citing *Commerce Bank, N.A. v. Plotkin*, 627 N.E.2d 746, 749 (Ill. App. Ct. 1994)).

The Court noted that the elements of a cause of action for abuse of process are (1) the existence of an ulterior purpose or motive and (2) some act in the use of legal process not proper in the regular prosecution of the proceedings.   *Id*. (citing *Kumar v. Bornstein*, 820 N.E.2d 1167, 1173 (Ill. App. Ct. 2004)).

Plaintiffs' TAC attempts to surmount previous deficiencies by pleading that "Defendants initiated and caused court processes to be issued in the Mundelein Litigation for the improper purposes of delay and to impose costs on the Plaintiffs."   TAC, 39. Additionally, Plaintiffs complain "Defendants caused the court to

issue scheduling, discovery and similar orders that delayed the litigation from 2007 until 2010, as admitted and celebrated [by Defendants internal documents]." *Id.*

As this Court previously noted, Plaintiffs have clearly stated an ulterior purpose to the litigation. The Court will, for the sake of argument, also accept that they have also referred to "process" in the sense understood by the tort of abuse of process. However, Plaintiffs still fail to allege that any process was used in a way that was not proper in the regular prosecution of the proceedings.

As Defendants point out, "[t]he gist of the action for abuse of process lies in the improper use of process *after* it has issued." Supervalu Mem. 6, ECF No. 165 (citing *Holiday Magic, Inc. v. Scott*, 282 N.E.2d 452, 457 (Ill. App. Ct. 1983); *see also Evans v. West*, 935 F.2d 922, 923 (7th Cir. 1991). "Regular and legitimate use of process, though with bad intentions, is not a malicious abuse of process." *Barrett v. Baylor*, 457 F.2d 119, 123 (7th Cir. 1972); *see also Ruehl Bros. Brewing Co. v. Atlas Brewing Co.*, 187 Ill.App. 392, 397 (1st Dist. 1914).

To illustrate, an Illinois Appellate Court found abuse of process where plaintiffs improperly leveraged an arrest warrant issued in what was essentially a debt collection action. In *Shatz v. Paul*, Paul and other creditors had Shatz arrested via a writ of *capias ad respondendum* on certain debts and, after having that writ

- 13 -

issued and executed, threatened to have him repeatedly arrested in a similar fashion on six other debts that were not the subject of the lawsuits that had resulted in the writs being issued. *Shatz v. Paul*, 129 N.E.2d 348, 350-351 (Ill. App. Ct. 1955).

But in *Dixon v. Smith-Wallace Shoe Co.*, there was no abuse of process in a default judgment case where a salesman's property was sold pursuant to a default judgment issued by the court. *See generally Dixon*, 119 N.E. 265 (Ill. 1918). The Illinois Supreme Court found there would also be no abuse of process even if the creditor had filed the suit knowing it to be false at the outset and "an attachment was maliciously issued and levied upon lands and a judgment in attachment and order of sale obtained without reasonable or probable cause and without actual notice to defendant." *Id*. at 242. That is because abuse of process exists only "where a party employs it [the process issued by the court] for some unlawful object or purpose [for] which it was not intended by the [court] to effect." *Id*. at 241-242.

*Plotkin* is very applicable to the instant suit. *Commerce Bank, N.A. v. Plotkin*, 627 N.E.2d 746 (Ill. App. Ct. 1994). In that case, the Illinois Appellate Court found no abuse of process where one of the parties, Commerce Bank, had received all necessary approvals from the city of Peoria to develop a piece of property into a shopping center. Commerce Bank alleged that Plotkin then instituted a meritless suit against Commerce for the sole purpose

of scaring off financing for the deal in order to extort a
settlement out of Commerce. Although Commerce lost millions of
dollars by having to sell, rather than lease, its land, there was
"no allegation of any misuse of 'process' issued by the court."
*Id.* at 749.

Here, Plaintiffs allege Defendants instituted a suit, by way
of proxy plaintiffs, that they could not have instituted themselves
for the purposes of delaying and/or destroying their competitor.
This is very analogous to *Plotkin*, and again, no misuse of process
after it was issued is alleged. Forgetting for the moment that
Rubloff settled the suits, even if the suits were meritless, abuse
of process would not lie without the use of some court-issued
process for which it was not intended. Here, the orders extending
the length of the suit (discovery orders and timetables, etc.) were
precisely what the state court intended them to be. Plaintiffs
cite several Northern District of Illinois cases finding abuse of
process, none of which stand for the proposition that merely using
a proxy plaintiff constitutes abuse of process. If this were true,
innumerable lawsuits funded by advocacy groups through a plaintiff
with standing to bring suit would result in abuse of process
lawsuits. That cannot be.

Plaintiffs again have failed to state a claim upon which
relief can be granted and the abuse of process claim is therefore
dismissed.

### E. Civil Conspiracy

The common law conspiracy claim in the SAC was dismissed because Plaintiffs failed to state any viable cause of action. Now, however, Plaintiffs have pled adequately the claim of tortious interference. But Defendants object that a principal cannot conspire with its agent because the agent's acts are considered the principal's acts. *Buckner v. Atl. Plant Maint., Inc.*, 694 N.E.2d 565, 571 (Ill. 1998). Plaintiffs did not respond to this argument. *See* Pls.' Mem., ECF No. 168, 19. However, in responding to this same objection by Defendants in the SAC, Plaintiffs argued that they never alleged a principal/agency relationship in their Complaint.

However, in the TAC, Plaintiffs make clear that Saint did Supervalu's bidding, was in constant communication with Supervalu via regular reports (particularly in regards to the tortious interference claim based on communication with the landlord of Menards) and "earned millions of dollars in fees and other compensation for its work performed for Supervalu." TAC, 11. Further, Plaintiffs allege that Supervalu earned millions in sales as a result of Saint delaying the shopping center. *Id.* at 12.

Even if the Complaint does not allege Saint had actual authority from Supervalu for its interaction with the Menards landlord, the Complaint alleges that Supervalu was informed of it afterwards, that the interaction succeeded in keeping Menards out

- 16 -

of the development, and that Supervalu benefited financially as a result. Plaintiffs have thus pled themselves out of a conspiracy complaint by pleading themselves into, at a minimum, an agency relationship by ratification.

"It is an established rule of agency that a subsequent ratification of the act of the agent is equivalent to an original authorization, and an agreement concluded by the agent and so ratified cannot be limited to a part of the agreement." *Vetesnik v. Magull*, 180 N.E. 390, 392 (Ill. 1932). "Justice does not permit one to accept the part of a transaction beneficial to him and repudiate that part detrimental." *Id.* Plaintiffs have pled, at a minimum, that Supervalu learned of the interference with the Menards lease and then accepted the profits of that interference, thereby ratifying it and creating an agency relationship.

Even if an agency relationship exists, protest Plaintiffs, Saint was self-interested, providing an exception to the rule that conspiracy cannot exist.

"The exception to this rule [that conspiracy cannot exist between agents] is where the interests of a separately incorporated agent diverge from the interests of the corporate principal and the agent at the time of the conspiracy is acting beyond the scope of his authority or for his own benefit, rather than that of the principal." *Bilut v. Northwestern Univ.*, 692 N.E.2d 1327, 1333 (Ill. App. Ct. 1998). Plaintiffs contend their allegations that

Saint was a land-use and zoning consultant satisfy this exception because Saint was economically interested in the fees for its services and furthering its reputation as a Walmart killer.

That an agent's pocketbook and professional reputation are enhanced by its work for the principal does not destroy the agency relationship. Were it so, the only true agency relationships that could exist would be an unpaid arrangement in which the agent did his work poorly. *See Salaymeh v. InterQual, Inc.*, 508 N.E.2d 1155, 1158 (Ill. App. Ct. 1987) (dismissing conspiracy charge against lawyer and law firm acting on behalf of the principal). All employees have a financial interest in the company they work for and, presumably, their personal reputation. Yet that alone does not destroy the presumption that the acts of the employee are the acts of the company. *See Bonanno v. La Salle and Bureau County R. Co.*, 409 N.E.2d 481, 486 (Ill. App. Ct. 1980) (affirming dismissal of conspiracy charge against officers and directors of a corporation because conspiracy "cannot exist between a corporation and its . . . employees").

The exception applies where the agent has an *independent* financial interest or motive that is not the principal's motive. *See Bilut v. Northwestern Univ.*, 692 N.E.2d 1327, 1332-1333 (Ill. App. Ct. 1998) ("The exception to this rule is where the interests of a separately incorporated agent *diverge* from the interests of the corporate principal . . . ") (emphasis added). There is no

allegation in the Complaint that Saint's interest diverged from that of its client, Supervalu.

Therefore, Plaintiffs have pled themselves out of a conspiracy claim, at least in regards to the interaction with Menards. The count is again dismissed.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss is granted in part and denied in part. The Motion to Dismiss the Claim of Tortious Interference with Prospective Economic Advantage (Count VI) is denied. The Motion to Dismiss the remainder of the Third Amended Complaint is granted.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 2/5/2013

- 19 -